**ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026**

**Nos. 25-5241(L), 25-5265, 25-5277, 25-5310**

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————————

PERKINS COIE LLP,

*Plaintiff-Appellee*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,

*Defendants-Appellants*.

————————

On Appeal from the United States District Court
for the District of Columbia,
Nos. 25-cv-00716, 25-cv-00916, 25-cv-00917, 25-cv-01107

————————

## BRIEF FOR PLAINTIFF-APPELLEE WILMERHALE

————————

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MATTHEW D. ROWEN
JOSEPH J. DEMOTT
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellee*
*Wilmer Cutler Pickering*
*Hale and Dorr LLP*

March 27, 2026

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Wilmer Cutler Pickering Hale and Dorr LLP certifies that it is a limited liability partnership with no parent corporation.  No corporation owns 10% or greater ownership interest in Wilmer Cutler Pickering Hale and Dorr LLP.

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.  Parties and Amici

References to all parties, intervenors, and amici appearing before the district court and in this Court appear in the government's opening brief.

### B.  Ruling Under Review

References to the rulings at issue appear in the government's opening brief.

### C.  Related Cases

This case has not previously been before this Court.  The Court has consolidated *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-5277, with three related appeals:  *Perkins Coie LLP v. United States Department of Justice*, No. 25-5241; *Jenner & Block LLP v. United States Department of Justice*, No. 25-5265; and *Susman Godfrey LLP v. Executive Office of the President*, No. 25-5310.  It has also ordered that these consolidated appeals be scheduled for oral argument on the same day and before the same panel as *Zaid v. Executive Office of the President*, No. 26-5009.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ i

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES.............. ii

    A.    Parties and Amici.................................................................................. ii

    B.    Ruling Under Review ........................................................................... ii

    C.    Related Cases ...................................................................................... ii

TABLE OF AUTHORITIES............................................................................... v

GLOSSARY OF ABBREVIATIONS ................................................................ ix

INTRODUCTION .............................................................................................. 1

ISSUES PRESENTED........................................................................................ 4

STATEMENT OF THE CASE............................................................................ 4

    A.    The President Issues Executive Orders Punishing Law Firms, Including WilmerHale, for Advocacy He Disfavors ............................ 4

    B.    Several Prominent Law Firms Avoid Sanctions by Pledging to Support Causes the President Favors ................................................ 8

    C.    WilmerHale Successfully Sues to Enjoin and Invalidate the Order...................................................................................................10

STANDARDS OF REVIEW ..............................................................................11

SUMMARY OF ARGUMENT...........................................................................11

ARGUMENT .................................................................................................... 14

I.    The District Court Correctly Held The Order Unconstitutional.................. 14

    A.    The Order Violates the First Amendment Several Times Over ........................................................................................... 15

        1.    The Order is textbook retaliation for protected conduct .................................................................................... 15

2.    The Order openly discriminates against disfavored speakers and viewpoints ........................................................... 20

3.    The Order violates the Petition Clause ................................... 24

4.    The Order abridges free association ........................................ 25

B.    The Order Exceeds the President's Authority and Violates the Separation of Powers ............................................................................. 26

C.    The Order Violates Multiple Other Constitutional Provisions ...................................................................................... 29

II.    The District Court Properly Enjoined The Entire Order ............................ 30

A.    The District Court Correctly Concluded That the Order Is an Integrated Whole That Must Stand or Fall in Its Entirety ................ 31

B.    The Order's Indiscriminate Blanket Suspension of Security Clearances Is Not Insulated from Judicial Review ........................... 33

C.    The Government's Late-Breaking Argument That the President *Did* Make Individualized Determinations Is Waived and Implausible .................................................................................... 37

CONCLUSION ................................................................................................... 40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
594 U.S. 595 (2021)......................................................................................25

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) .....................................................................15

*Atl. Richfield Co. v. Christian*,
590 U.S. 1 (2020)..........................................................................................20

*Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*,
457 U.S. 853 (1982)......................................................................................36

*Borough of Duryea v. Guarnieri*,
564 U.S. 379 (2011)......................................................................................24

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)......................................................................................24

*Cohen v. Hurley*,
366 U.S. 117 (1961)........................................................................................1

*Dep't of Commerce v. New York*,
588 U.S. 752 (2019)......................................................................................40

*Dep't of Navy v. Egan*,
484 U.S. 518 (1988)................................................................................ 34, 37

*Doe v. Gates*,
981 F.2d 1316 (D.C. Cir. 1993) ...................................................................35

*Edwards v. Aguillard*,
482 U.S. 578 (1987)......................................................................................35

*El-Ganayni v. U.S. Dep't of Energy*,
591 F.3d 176 (3d Cir. 2010).........................................................................35

---

[*] Authorities on which this brief chiefly relies are marked with an asterisk.

*Eng v. Cooley*,
    552 F.3d 1062 (9th Cir. 2009)................................................16

*Ex parte Garland\**,
    71 U.S. 333 (1866)........................................... 13, 27, 28

*Goodyear Tire & Rubber Co. v. Haeger\**,
    581 U.S. 101 (2017)........................................... 28, 29

*Hartman v. Moore*,
    547 U.S. 250 (2006)...............................................20

*Heffernan v. City of Paterson*,
    578 U.S. 266 (2016)...............................................22

*Hous. Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)...............................................16

*In re Al-Nashiri*,
    47 F.4th 820 (D.C. Cir. 2022) ..................................15

*In re Halkin*,
    598 F.2d 176 (D.C. Cir. 1979) ................................16

*Keepseagle v. Perdue*,
    856 F.3d 1039 (D.C. Cir. 2017) ..............................38

*League of United Latin Am. Citizens*
    *v. Exec. Off. of the President*,
    780 F.Supp.3d 135 (D.D.C. 2025) ..........................20

*Lee v. Garland*,
    120 F.4th 880 (D.C. Cir. 2024) .................... 4, 14, 30, 34, 37

*Legal Servs. Corp. v. Velazquez\**,
    531 U.S. 533 (2001)..................... 1, 3, 12, 13, 16, 23, 27, 28

*Lehnert v. Ferris Faculty Ass'n*,
    500 U.S. 507 (1991).............................................16

*Lozman v. City of Riviera Beach\**,
    585 U.S. 87 (2018)........................................... 12, 15

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999).................................................................27

*Nat'l Fed'n of Fed. Emps. v. Greenberg\**,
  983 F.2d 286 (D.C. Cir. 1993) ................................................34

*Nat'l Rifle Ass'n of Am. v. Vullo\**,
  602 U.S. 175 (2024)........................................... 1, 20, 21, 24

*Perry v. Sindermann\**,
  408 U.S. 593 (1972)................................................................36

*Rattigan v. Holder*,
  689 F.3d 764 (D.C. Cir. 2012) ...............................................34

*Rosenberger v. Rector of Univ. of Va.*,
  515 U.S. 819 (1995)................................................................21

*Rutan v. Republican Party of Ill.*,
  497 U.S. 62 (1990)..................................................................36

*SEC v. Jarkesy*,
  603 U.S. 109 (2024)..................................................................3

*Stern v. Marshall\**,
  564 U.S. 462 (2011)................................................................28

*Students for Fair Admissions
  v. President & Fellows of Harvard Coll.*,
  600 U.S. 181 (2023)..................................................................6

*Trump v. United States*,
  603 U.S. 593 (2024)................................................................34

*Ukrainian-Am. Bar Ass'n v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990) .............................................16

*United States v. Regenerative Scis., LLC*,
  741 F.3d 1314 (D.C. Cir. 2014) .............................................11

*W. Va. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)................................................................21

vii

*Webster v. Doe*,
 486 U.S. 592 (1988)......................................................................................35

*Youngstown Sheet & Tube Co. v. Sawyer*,
 343 U.S. 579 (1952)......................................................................................27

**Constitutional Provision and Rule**

U.S. Const. art. III, §1 ..................................................................................26

Fed. R. App. P. 28(*i*)....................................................................................30

## GLOSSARY OF ABBREVIATIONS

| Abbreviation | Definition |
| --- | --- |
| Order | Executive Order 14250 |
| EEOC | Equal Employment Opportunity Commission |
| WilmerHale | Wilmer Cutler Pickering Hale and Dorr LLP |
| Perkins | Perkins Coie LLP |
| Paul Weiss | Paul, Weiss, Rifkind, Wharton & Garrison LLP |

**INTRODUCTION**

"When the Founders of this Nation drew up our Constitution, they were uneasily aware of th[e] English practice" of imposing harsh sanctions on "any barrister who refused to 'co-operate' with the King's courts." *Cohen v. Hurley*, 366 U.S. 117, 139-40 (1961) (Black, J., dissenting). "[T]he Founders were singularly unimpressed by the long history of such English practices," so they "fought a revolution and wrote a Constitution to get rid of [them]." *Id.* at 141-42. John Adams embodied the Framers' ideals in his willingness to defend the very agents of the Crown from which we would soon declare our independence. And the Constitution embodies these ideals with multiple "safeguards of the lawyer's independence," including "the protection[s] of the First Amendment," "the requirements of due process and equal protection of the laws," and the prohibition on "bills of attainder." *Id.* at 141-44. In short, our justice system depends on an "informed, independent bar," *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001), so "[g]overnment officials cannot attempt to coerce" lawyers or law firms "in order to punish or suppress views that the government disfavors," *Nat'l Rifle Ass'n of Am. v. Vullo*, 602 U.S. 175, 180 (2024).

Executive Order 14250 ("Order") strikes at the heart of these bedrock principles. It unabashedly proclaims the President's desire to retaliate against the law firm Wilmer Cutler Pickering Hale and Dorr LLP ("WilmerHale") for

representing clients and causes he dislikes and expressing viewpoints with which he disagrees. And it imposes draconian punishments on WilmerHale for engaging in these expressive activities, restricting WilmerHale employees' access to federal buildings (including courthouses), directing federal employees not to engage with them, and transparently attempting to pressure WilmerHale's clients to stop doing business with it.

The district court correctly held that this remarkable Order violates eight constitutional guarantees. By targeting WilmerHale for handling litigation the President disfavors, for example, "[t]he Order blatantly defies" the "bedrock principle" that government officials may not "retaliat[e] against individuals for engaging in protected speech." JA2833-35. The Order is equally brazen in flouting the prohibition on viewpoint discrimination: It openly declares that WilmerHale is being punished for its perceived "partisan" and "political" views, including its decision to "welcom[e]" Robert Mueller back to the firm following his work as Special Counsel. JA2838-39. These egregious First Amendment violations pose a severe threat to the legal profession and the rule of law. In fact, the threat of similar sanctions induced nine of the country's largest law firms to pledge nearly a *billion* dollars in legal services towards causes the President favors.

If more were needed, the Order also severely threatens our Nation's independent judiciary. Courts depend on attorneys to "present all the reasonable and

2

well-grounded arguments necessary for proper resolution of the case." *Velazquez*, 531 U.S. at 545. Official reprisals against attorneys who "mak[e] certain arguments and represent[] certain clients," JA2853—particularly reprisals from the President himself—necessarily chill zealous advocacy, "threaten[ing] severe impairment of the judicial function." *Velazquez*, 531 U.S. at 546. And the separation-of-powers problems go deeper still, as the Order not only "encroaches on the Judiciary's exclusive power" to oversee litigation and sanction abuses of the judicial process, JA2852-53, but effectively consolidates "the roles of prosecutor, judge, and jury in the hands of the Executive," *SEC v. Jarkesy*, 603 U.S. 109, 140 (2024).

Lacking any colorable argument that the Order is constitutional, the government's brief labors to salvage isolated pieces of it. But both the Order's plain text and the rest of the record make clear that the Order is a single, unified act of impermissible retaliation for protected expression, designed to "stand or fall as a whole." JA2817. This Court thus need not reach any issues about the scope of its ability to review executive action involving security clearances, as the district court acted well within its discretion in enjoining the Order's indiscriminate suspension of WilmerHale employees' security clearances on the straightforward and sufficient ground that it is inseverable from the rest of the Order. Regardless, this case does not involve, much less ask the Court to "second-guess," any "discretionary judgments about matters of national security." *Cf. Lee v. Garland*, 120 F.4th 880,

891 (D.C. Cir. 2024).  It instead involves the *en masse* revocation of security clearances in retaliation for a law firm's representation of clients and causes the President dislikes.  Whatever the scope of the Executive's discretion vis-à-vis security clearances, it does not include the power to revoke them in avowed retaliation for protected expression, without undertaking any "predictive judgment" about "whether an individual is sufficiently trustworthy" to access national-security information.  *Cf. id.* at 891, 893.

In short, the Order is riddled with constitutional defects.  The district court was amply justified—and certainly did not abuse its discretion—in enjoining its enforcement *in toto*.

## ISSUES PRESENTED

1. Whether the district court correctly held that the Order is unconstitutional.

2. Whether the district court acted within its discretion in enjoining enforcement of the entire Order.

## STATEMENT OF THE CASE

**A.    The President Issues Executive Orders Punishing Law Firms, Including WilmerHale, for Advocacy He Disfavors.**

During and after the 2024 presidential election, President Trump repeatedly "threatened to 'go after' his political opponents" and explicitly extended that threat to their "[l]awyers" and "law firms."  JA2806-07; *see* JA2461.  Once elected, he promptly followed through.  JA2807.  Within three months of taking office, the

4

President issued a series of executive orders targeting several law firms, including WilmerHale, JA2332-35, and Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), JA2584-87.

The WilmerHale Order begins by declaring the Administration's "commit[ment] to addressing the significant risks associated with law firms … that engage in conduct detrimental to critical American interests." JA2332. It asserts that "[m]any firms take actions that threaten public safety and national security, limit constitutional freedoms, degrade the quality of American elections, or undermine bedrock American principles." JA2332. And it criticizes firms for supposedly "conduct[ing] this harmful activity through their powerful pro bono practices, earmarking hundreds of millions of their clients' dollars for destructive causes." JA2332.

The Order then turns to WilmerHale in particular, describing it as "yet another law firm that has abandoned the profession's highest ideals and abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." JA2332. As one "example," the Order asserts that WilmerHale "engages in obvious partisan representations to achieve political ends," an apparent reference to WilmerHale's representation of President Trump's political opponents. JA2332; *see* JA2358. The Order's second "example" of WilmerHale's supposedly "egregious conduct" is "support[ing] efforts to discriminate on the basis of race," JA2332, an

apparent reference to WilmerHale's representation of Harvard University in *Students for Fair Admissions v. President & Fellows of Harvard College*, 600 U.S. 181 (2023).  The Order next accuses WilmerHale of "back[ing] the obstruction of efforts to prevent illegal aliens from committing horrific crimes and trafficking deadly drugs within our borders," an apparent reference to the firm's successful challenges to certain immigration-related policies.  JA2332; *see* JA2357.  Finally, the Order accuses WilmerHale of "further[ing] the degradation of the quality of American elections," an apparent reference to WilmerHale's involvement in challenges to state voting laws.  JA2332; *see* JA2357-58.

The Order singles out specific individuals for special opprobrium—in particular, the late Robert Mueller, retired partner James Quarles, and current partner Aaron Zebley.  By appointment of President Trump's own Acting Attorney General, Mueller left WilmerHale to serve as Special Counsel, assisted by Quarles and Zebley, in the Department of Justice's investigation into allegations of Russian interference in the 2016 presidential election.  JA2350-52.  The Order derides the investigation as "one of the most partisan investigations in American history" and accuses those attorneys of "weaponiz[ing] the prosecutorial power to upend the democratic process and distort justice."  JA2333.  The Order then attacks WilmerHale for "reward[ing]" these attorneys by "welcoming them" back "to the firm" after their government service.  JA2333.

Sections 2 through 5 of the Order impose a range of punishments for these perceived transgressions.  Section 2(a) directs the heads of federal agencies "to suspend any active security clearances held by individuals at WilmerHale, pending a review of whether such clearances are consistent with the national interest." JA2333.  Section 2(b) directs agency heads to "expeditiously cease" providing "Government goods, property, materials, and services … for the benefit of WilmerHale."  JA2333.  Section 3 directs agency heads to "require Government contractors to disclose any business they do with WilmerHale and whether that business is related to the subject of the Government contract."  JA2333.  Agency heads must also "terminate any contract" involving WilmerHale, and "otherwise align their agency funding decisions with the interests of the citizens of the United States" and "the goals and priorities of [the President's] [a]dministration."  JA2334.

Section 4 cross-references §4 of the order targeting Perkins Coie LLP ("Perkins"), JA2334, which directs the Chair of the Equal Employment Opportunity Commission ("EEOC") to "review the practices of representative large, influential, or industry leading law firms for consistency with Title VII of the Civil Rights Act of 1964," and directs the Attorney General to investigate large law firms that "do business with Federal entities for compliance with race-based and sex-based non-discrimination laws."  JA2488.

Section 5(a) instructs agencies to issue guidance "limiting official access" to federal buildings "to employees of WilmerHale when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." JA2334. It also directs agency heads to "provide guidance limiting Government employees acting in their official capacity from engaging with WilmerHale employees to ensure consistency with the national security and other interests of the United States." JA2334. Finally, §5(b) directs agency officials to "refrain from hiring employees of WilmerHale, absent a waiver from the head of the agency." JA2334.

The Order was accompanied by an even more incendiary "Fact Sheet." JA2337-38. The sheet brands WilmerHale as a "rogue law firm[]," summarizes the various retaliatory actions against WilmerHale, and asserts that the Order will "ensure accountability for past misconduct" and help "end weaponization of the Federal government." JA2337-38 (formatting altered).

**B.      Several Prominent Law Firms Avoid Sanctions by Pledging to Support Causes the President Favors.**

WilmerHale and its co-appellees separately challenged the executive orders leveled against them. Paul Weiss chose a different path. In exchange for formal rescission of an order purporting to identify it as a national-security risk, Paul Weiss promised "a remarkable change of course." JA2601; *see* JA2597-99. According to the President, the firm "acknowledged the wrongdoing of its former partner Mark

8

Pomerantz," whom the order accused of "manufactur[ing] a prosecution against" the President, "unethically le[ading] witnesses in ways designed to implicate [him]," and "engag[ing] in a media campaign to gin up support for this unwarranted prosecution."  JA2601; JA2584-85.  Paul Weiss "agreed to a number of policy changes," including "a policy of political neutrality with respect to client selection and attorney hiring"; "taking on a wide range of pro bono matters representing the full political spectrum"; and abandoning "diversity, equity, and inclusion policies." JA2601; *accord* JA2597-98.  Paul Weiss also pledged "$40 million in pro bono legal services over the course of President Trump's term to support the Administration's initiatives."  JA2598.

Following the Paul Weiss agreement, eight other large law firms struck similar deals with the President.  *See* JA3178-79; JA2667-96.  As part of these agreements, the firms collectively pledged nearly a *billion dollars* "in free legal work to causes [the President] supports."  JA3179.  In exchange, the government agreed to end the EEOC investigations (referenced in §4 of the Order) into the compliant firms. JA3179.  The White House described these agreements as "build[ing] an unrivaled network of Lawyers, who will put a stop to Partisan Lawfare in America," JA2689, and stated that the President "looks forward to putting [the firms'] pro bono legal concessions toward implementing his America First agenda," JA3179.

9

### C.    WilmerHale Successfully Sues to Enjoin and Invalidate the Order.

The WilmerHale Order was issued the evening of March 27, 2025.  JA2332.  The next morning, WilmerHale sued and moved for emergency relief.  JA2273.  The district court held a hearing and entered a temporary restraining order later that day, explaining that the Order's "retaliatory nature" "is clear from its face," and "there is no doubt this retaliatory action chills speech and legal advocacy."  JA2374; *see* JA2376-77.

Shortly thereafter, the parties agreed that discovery was unnecessary and filed dispositive motions.  *See* JA2257-58.  Following a hearing, the court granted summary judgment to WilmerHale on eight constitutional claims.  JA2877-78.  After rejecting the government's threshold arguments, the court held that the Order unconstitutionally retaliates against WilmerHale for protected expression; unconstitutionally discriminates on the basis of viewpoint; violates the Petition Clause, freedom of association, and the separation of powers; deprives WilmerHale of liberty interests without due process of law; is unconstitutionally vague; and violates WilmerHale's clients' Sixth Amendment right to counsel.  JA2833-62; JA2868-71.  The court accordingly declared the Order facially unconstitutional *in toto* and enjoined all relevant actors "from implementing or giving effect to [it]."  JA2887.

10

Three other district judges likewise granted summary judgment to Perkins, Jenner & Block LLP, and Susman Godfrey LLP in their respective cases. The government appealed all four decisions. JA1730; JA2240; JA2892; JA3541. But despite the asserted national-security motivations for the orders, it did not seek a stay pending appeal from any court and even requested (and obtained) a 45-day extension that delayed appellate briefing. Then, just four days before its opening brief was due, the government moved to voluntarily dismiss the appeals, only to reverse course less than 24 hours later when it moved without explanation to withdraw its dismissal motion. This Court granted the latter motion, allowing the appeals to proceed.

## STANDARDS OF REVIEW

The district court's grant of summary judgment is reviewed *de novo*; its entry of injunctive relief is reviewed for abuse of discretion. *United States v. Regenerative Scis., LLC*, 741 F.3d 1314, 1318 (D.C. Cir. 2014).

## SUMMARY OF ARGUMENT

The Executive Order singling out WilmerHale for its protected expression and advocacy is a direct assault on (among other things) the First Amendment, core separation-of-powers principles, and our adversarial justice system. The district court correctly and emphatically invalidated the Order in its entirety as blatantly unconstitutional in myriad respects. The government falls far short of salvaging any

11

aspect of the President's unconstitutional endeavor.  The Order was designed as a whole to maximize its chilling effect and deserves to be invalidated in full.

**I.** First, the Order violates the First Amendment several times over.  It defies the fundamental principle that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman v. City of Riviera Beach*, 585 U.S. 87, 90 (2018).  WilmerHale's advocacy on behalf of clients in litigation is "speech and expression" protected by the First Amendment. *Velazquez*, 531 U.S. at 545; *see id.* at 547-49.  By penalizing WilmerHale for representing disfavored clients and causes (among other expressive activities), the Order impermissibly retaliates for core protected speech.  The Order likewise violates the prohibition on viewpoint discrimination, targeting the firm for its perceived disagreement with the President's views.  And the Order violates the Petition Clause by punishing WilmerHale for filing lawsuits in the past and restricting its ability to do so in the future.  On top of that, the Order's requirement that federal contractors "disclose any business they do with WilmerHale," JA2333, impermissibly coerces speech and burdens the freedom of association.

The Order also blatantly violates the separation of powers.  Nothing in Article II authorizes the President to punish law firms for the clients they represent or the arguments they advance in court.  To the contrary, overseeing litigation conduct is the exclusive province of the Article III courts.  *See Ex parte Garland*, 71 U.S. 333,

12

378-80 (1866). The Order usurps that authority, overtly attempting to punish law firms for perceived abuses in handling litigation before Article III courts, and to "exclude from litigation those arguments and theories [the President] finds unacceptable but which by their nature are within the province of the courts to consider." *Velazquez*, 531 U.S. at 546. Those separation-of-powers violations "threaten[] severe impairment of the judicial function," depriving courts of the "informed, independent" adversarial presentation on which an "informed, independent judiciary" depends. *Id.* at 545-46.

**II.** Unable to seriously dispute the Order's egregious unconstitutionality, the government tries to divide and salvage isolated pieces. But the Order embodies a single, unified act of retaliation—unified precisely to maximize its chilling effect—that must rise or fall as a whole, just as the President imposed and then revoked the Paul Weiss order as a whole. That dooms not just §1, the retaliatory glue that holds it together, but also §2(a)'s *en masse* suspension of security clearances. Regardless, even viewed in isolation, §2(a) is unlawful, and nothing bars courts from considering constitutional challenges to the kind of blanket suspension of security clearances that §2(a) effectuates. WilmerHale's claims do not require judicial review of any "Executive Branch judgments about whether specific individuals pose a risk to national security," Gov't.Br.21. Indeed, the Order does not even *identify* any individual clearance holder, much less assess anyone's "intangible qualities such as

13

'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment.'" *Lee*, 120 F.4th at 893. The Order instead directs the suspension of *all* WilmerHale employees' clearances, in overt retaliation for the firm's representation of causes and clients the President disfavors. Courts are not powerless to enjoin such a blatant abuse of executive power.

## ARGUMENT

## I.    The District Court Correctly Held The Order Unconstitutional.

The district court correctly concluded that the Order flouts the Constitution eight times over. Nothing in the government's brief provides any reason to question that conclusion as to any—let alone all—of the independent grounds on which WilmerHale prevailed.[1]

---

[1] The government obliquely challenges standing and ripeness. Its arguments can be quickly dispatched. "There can be no serious dispute over whether WilmerHale has standing to challenge the Order." JA2819. The Order "includes multiple directives targeting the firm, its employees, and its clients." JA2819. WilmerHale plainly has standing based on "economic injury" and "injuries to its First Amendment rights," JA2820, as well as "third-party standing to bring claims on behalf of its clients," JA2826. The government scarcely argues otherwise, offering only a cursory assertion that WilmerHale "lack[s] standing" to challenge §4 because it purportedly does not "single[] out" WilmerHale. Gov't.Br.46. But WilmerHale has standing to challenge the entire inseverable Order, *see infra* pp.30-33, and §4 in particular. Indeed, the whole point of including §4 in the WilmerHale Order was to underscore that WilmerHale was a target of the direction to "the EEOC and Attorney General to investigate invidious discrimination by large law firms." Gov't.Br.41. Section 4 thus plainly directs the EEOC and Attorney General to investigate such purported "discrimination" by WilmerHale. That is injury-in-fact. *See also* Jenner.Br.43-45; Susman.Br.39-41. And the government's ripeness arguments are equally weak. Each of WilmerHale's claims "presents a concrete legal dispute," and

## A.    The Order Violates the First Amendment Several Times Over.

### 1.    The Order is textbook retaliation for protected conduct.

It is black-letter law that "the First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech." *Lozman*, 585 U.S. at 90.  The Order "blatantly defies this bedrock principle" because "[it] is, on its face, retaliation for the firm's protected speech."  JA2833; JA2835.

To prove retaliation, WilmerHale needed to show (1) that it "engaged in conduct protected under the First Amendment"; (2) that the government "took some retaliatory action sufficient to deter a person of ordinary firmness in [WilmerHale]'s position from speaking again"; and (3) "a causal link between the exercise of a constitutional right and th[at] adverse action."  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).  The district court correctly held that WilmerHale established all three requirements.  JA2833-38.

First, WilmerHale's "advocacy" on behalf of "clients in litigation" is "unquestionably protected conduct under the First Amendment."  JA2834 (citing

---

"no further factual development is essential to clarify the issues.'" *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022).  To be sure, due to the speed with which WilmerHale obtained preliminary relief, federal agencies never developed guidance fleshing out *how* to discriminate against WilmerHale in government contracting and restrict its employees' access to government buildings.  Gov't.Br.49-50.  But "WilmerHale's claims turn on the constitutionality of the Order *as issued*—not on any [implementing] guidance."  JA2827; *see also* Jenner.Br.45-47; Susman.Br.34-37.

*Velazquez*, 531 U.S. at 545; *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 528 (1991)). "[G]overnment action seeking to limit an attorney's advocacy 'on behalf of' a client implicates the client's, as well as the attorney's, First Amendment interests—the attorney is, after all, the client's speaker hired to deliver the client's message." *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009). And "the long-recognized First Amendment right to hire and consult an attorney" "would ring hollow if the state could simply retaliate for the lawyer's *advocacy* on behalf of the client." *Id.* In short, WilmerHale "attorneys and [clients] retain their First Amendment rights even as participants in the judicial process," and they may not constitutionally be punished for taking positions in court that the President does not like. *In re Halkin*, 598 F.2d 176, 187 (D.C. Cir. 1979), *overruled in part on other grounds by Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 31-32, 37 (1984); *accord, Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990).

Second, the Order plainly "constitutes a sufficiently adverse action" against WilmerHale, i.e., an action that would deter an entity of "ordinary firmness" from exercising its First Amendment rights, which is all that is necessary to show retaliation. *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 477 (2022). The district court catalogued the "kitchen sink of *severe* sanctions" that the Order imposes on WilmerHale: "In addition to vilifying the firm," it "suspends WilmerHale employees' security clearances," "coerces the firm's federal contractor clients to end

16

their engagements with the firm," "targets the firm for investigation into supposed racial discrimination," "threatens to bar its employees from entering federal buildings or engaging with federal employees," "and prohibits agencies from hiring firm employees absent a waiver from the relevant agency heads." JA2835.

These draconian punishments easily meet the standard for "adverse action." Indeed, the Order's sanctions not only *could* "deter a person of ordinary firmness in WilmerHale's position" from engaging in First Amendment activity; they *did* in fact deter several prominent law firms from engaging in First Amendment activity. JA2835-36; *see supra* pp.8-9. Those firms were sufficiently fearful that they collectively agreed not only to conform their client and case-selection practices to the President's wishes, but to devote nearly a billion dollars in pro bono resources "to causes that the President … support[s]" (among other concessions) to avoid a similar executive order. JA2597-99; *see, e.g.*, JA2667-68; JA2677-78; JA2689; JA3179.

Third, the Order "makes clear the causal link between the protected speech and the retaliatory conduct." JA2837. It openly proclaims that it was motivated by WilmerHale's alleged "engage[ment] in obvious partisan representations to achieve political ends," the firm's defense of a client's race-conscious college admission policies, its advocacy on behalf of "illegal aliens," its involvement in litigation related to "American elections," and its employment (and approbation) of Mueller.

17

JA2332-33. And there is more, as the accompanying "Fact Sheet" underscores that the Order is designed to punish WilmerHale for representing clients in litigation—in other words, for engaging in First Amendment activity. It asserts, for example, that WilmerHale has "abused its pro bono practice to engage in activities that undermine justice and the interests of the United States." JA2337-78. As the district court aptly put it, "[t]he Order shouts through a bullhorn: If you take on causes disfavored by President Trump, you will be punished!" JA2836.

The government's cursory response is unpersuasive. At the outset, the notion that the Order primarily targets conduct that does not enjoy First Amendment protection, *see* Gov't.Br.52-54, is fanciful. While the Order makes a passing claim that WilmerHale "discriminates against its employees based on race," JA2333, the bulk of §1—and the accompanying "Fact Sheet"—criticizes the firm's protected expression. As explained, the Order attacks the supposedly "partisan" nature of WilmerHale's involvement in *Students for Fair Admissions*, immigration-related litigation, and election-related litigation, as well as its association with and praise for Mueller. JA2332-33; *see supra* pp.5-6. And the fact that the Order's discussion of Mueller relates to "past official conduct," Gov't.Br.54, is immaterial. The Order does not impose sanctions *for* that past conduct; it punishes WilmerHale because of its *views* about that conduct.

Unable to deny that the Order penalizes WilmerHale for protected expression, the government argues that the "President would have issued [the Order] based on" WilmerHale's allegedly unlawful diversity, equity, and inclusion policies alone. Gov't.Br.55; *see* Gov't.Br.46-48. The government did not raise that argument below, so it is forfeited. It is also specious. Section 1 of the Order makes crystal clear that WilmerHale has been singled out for its protected expression. Sections 2 through 5 confirm as much, as most of their speech-chilling punishments have nothing to do with the discrimination allegations. The government's treatment of other firms provides further confirmation. By its own account, many "large law firms" have engaged in allegedly discriminatory employment practices. JA2488; *see* JA2692. But only five firms—including WilmerHale—were subjected to an executive order. What is more, diversity policies are a conspicuously minor piece of the President's deals with Paul Weiss and other firms. Those firms avoided sanctions by agreeing to adopt "political neutrality with respect to client selection and attorney hiring," change the "political" valence of their "pro bono matters," and pledge millions of dollars' worth of "legal services … to support the Administration's initiatives." JA2597-98; JA2601; *see* JA2667-68; JA2677-78; JA2689; JA3179. The district court thus correctly held that there is a "causal link between [WilmerHale]'s protected speech" and "[t]he sanctions laid out in §§2 through 5" of the Order. JA2837.

Finally, the government's argument that the district court "fail[ed] to properly analyze [WilmerHale's] facial challenge," Gov't.Br.50-52, is both forfeited and meritless. When the government wields its power "to punish [constitutionally protected] advocacy," it "violates the First Amendment"—full stop. *Vullo*, 602 U.S. at 194. Because the Order retaliates against protected speech, it has *no* constitutional applications, let alone any "plainly legitimate sweep," Gov't.Br.51. As the Supreme Court has explained, "[o]fficial reprisal for protected speech offends the Constitution," even if the challenged action would "be unexceptionable if taken on other grounds." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). And, *contra* Gov't.Br.42, 51, the Order's unlawfulness is not saved by boilerplate statements that it should be applied consistent with applicable law, *see, e.g.*, *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 23 (2020). "If [an] executive order cannot possibly be implemented consistent with applicable law, a command to do so in a saving clause is meaningless." *League of United Latin Am. Citizens v. Exec. Off. of the President*, 780 F.Supp.3d 135, 176 (D.D.C. 2025).

### 2. The Order openly discriminates against disfavored speakers and viewpoints.

The district court correctly held that the Order violates another core First Amendment principle: the prohibition on viewpoint discrimination. *See* JA2838-43. "[N]o official, high or petty, can prescribe what shall be orthodox in politics, … religion, or other matters of opinion." *W. Va. State Bd. of Educ. v.*

20

*Barnette*, 319 U.S. 624, 642 (1943).  Needless to say, the higher the official, the more troubling an effort to prescribe orthodoxy and punish disfavored viewpoints becomes.  While the President may "share h[is] views freely and criticize particular beliefs," the First Amendment forbids "us[ing] the power of the State to punish or suppress disfavored expression."  *Vullo*, 602 U.S. at 188.  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 829 (1995).  The Order cannot be reconciled with these bedrock principles.

Indeed, the Order discriminates based on viewpoint in multiple respects.  First, it attributes certain views to WilmerHale and punishes the firm (and all its employees and clients) because the President disagrees with them.  For example, the Order targets WilmerHale for using "its pro bono practice to engage in activities that"—in the President's view—"undermine justice and the interests of the United States."  JA2332.  Once again, the President's rescission of the Paul Weiss order—and his acceptance of similar (even more lavish) offers of pro bono services for favored causes from multiple other firms—confirms that the Order is designed to punish disfavored viewpoints unless and until WilmerHale changes its tune and agrees to promote viewpoints the President favors, i.e., "his America First agenda," which he claims the law firms that capitulated to him will "implement[]."  JA3179.

Viewpoint discrimination is particularly evident in the Order's direction to prioritize WilmerHale for investigation of recruiting and advancement policies. *See* JA2334; JA2488. The evident basis for prioritizing WilmerHale over other firms with materially analogous policies is the viewpoint the Order attributes to WilmerHale's representations. And as the threats of investigation make clear, that viewpoint discrimination "caus[es] precisely th[e] same harm" regardless of whether WilmerHale or its attorneys actually have the political affiliations or viewpoints the President claims. *Heffernan v. City of Paterson*, 578 U.S. 266, 273-74 (2016).

The Order also explicitly targets WilmerHale based on the speech and viewpoints of Robert Mueller and those who assisted him, and based on WilmerHale's association with them and its own speech about their public service. The President has repeatedly insisted that Mueller's investigation was a "hoax" and a partisan "witch hunt." JA2806. The Order likewise asserts that "Mueller's investigation epitomizes the weaponization of government." JA2333. Moreover, the Order not only specifically criticizes WilmerHale for "welcoming" Mueller, Zebley, and Quarles back "to the firm"—characterizing this as "reward[ing]" them for their part in the investigation—but faults WilmerHale for "claim[ing]" that Mueller "embodies the highest value[s] of our firm and profession." JA2333. The President is free to disagree with that assessment (and with viewpoints WilmerHale attorneys have advanced personally and/or for clients). But invoking that

disagreement as the justification for multiple adverse government actions—all of which apparently can be lifted as a reward for a change of viewpoint—is the *ne plus ultra* of viewpoint discrimination.

Similarly, while the President may disagree with Mueller's decision to accept the invitation (by President Trump's own Justice Department) to serve as Special Counsel, or with the viewpoints expressed in his report, or with WilmerHale's decision to welcome him back after his service, the President may not penalize the firm based on its association with Mueller and his (real or perceived) viewpoints. Nor may the President punish WilmerHale attorneys' decisions to represent certain clients or causes and not others because he disagrees with them—even if he deems certain lawsuits "harmful" or "detrimental to critical American interests" and others more worthy of pursuing, JA2332. This is First Amendment 101. Government action "cannot be aimed at the suppression of ideas thought inimical to the Government's own interest," whether those ideas are expressed in the town square or by "litigants and their attorneys." *Velazquez*, 531 U.S. at 548-49.

The government has no meaningful counterargument. It acknowledges that §1 of the Order "takes a particular viewpoint and rejects others," but insists that "the Executive Branch has the right to speak for itself." Gov't.Br.61. But again, while a "government official can share her views freely and criticize particular beliefs … in the hopes of persuading others," "she cannot … use the power of the State to punish

or suppress disfavored expression." *Vullo*, 602 U.S. at 188.  The Order unabashedly does the latter, imposing severe sanctions on WilmerHale for expressing different views.  The district court correctly held that it impermissibly "targets the firm for its disfavored viewpoints and punishes it for expressing those viewpoints."  JA2838.

### 3.     The Order violates the Petition Clause.

The Order violates the right "to petition the Government for a redress of grievances."  U.S. Const. amend. I.  The right to petition "extends to all departments of the Government," *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972), and includes filing and pursuing lawsuits, *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).  As the district court explained, the Order burdens this right "by (1) punishing the firm for its past representation of clients in litigation and (2) undermining the firm's ability to pursue litigation in the future" by restricting its access to federal buildings and engagement with government employees. JA2844-45.  These burdens abjectly fail "exacting scrutiny," as they are unrelated to any legitimate government interest, and in fact are motivated by the entirely illegitimate goal of suppressing disfavored expression.  JA2846-47.

Again, the government barely musters a response.  Its assertion that WilmerHale and its clients "remain free 'to advocate ideas' by bringing and pursuing lawsuits," Gov't.Br.58-59, ignores both the practical impediments the Order imposes—including the prohibition on entering government buildings—and its

24

massive chilling effects, *see* JA2827; JA2844-45 & n.18.  And the government's suggestion that WilmerHale should wait and "bring an as-applied challenge" if it is "ever actually inhibited from petitioning the government," Gov't.Br.59, ignores that WilmerHale already *has been* inhibited from petitioning:  The Order expressly sanctions it for lawsuits it brought in the past; federal officials began canceling meetings with WilmerHale attorneys shortly after the Order issued; and at least one client terminated an engagement with WilmerHale because of the Order.  *See* JA2428-29.  There is no basis for reversing the district court's Petition Clause holding.

### 4.    The Order abridges free association.

The district court correctly held that the Order's demand that government contractors "disclose any business they do with WilmerHale," JA2333, coerces speech and violates WilmerHale and its clients' First Amendment freedom of association. "[C]ompelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as other forms of governmental action." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (brackets omitted).  The Order's compelled-disclosure requirement "is subject to—and fails—exacting scrutiny." JA2848.  Its "sweeping inquiry into 'any business' federal contractors do with WilmerHale" is not remotely tailored to the government's "proffered interests in 'ensur[ing] that there is no transfer of taxpayer

dollars to entities that [allegedly] engage in racial discrimination' or managing contracts on which WilmerHale is a subcontractor." JA2848-49.

Again, the government's response is both thin and wide of the mark. The government asserts that WilmerHale is not "engaged in any expressive association when serving as [a] government contractor[] or sub-contractor[]." Gov't.Br.57. That is a non sequitur. The issue is that many of WilmerHale's *clients* have government contracts, and the disclosure mandate burdens *their* right to engage WilmerHale—including on matters unrelated to any federal contract. JA2847-48. Indeed, that is the whole point: The mandate is designed to pressure clients to stop working with WilmerHale. Likewise, the government's assertion that federal contractors "are already subject to substantial disclosure requirements as a condition of doing business with the federal government," Gov't.Br.57, does not change the fact that §3's WilmerHale-specific disclosure obligation is untethered to any conceivable legitimate government interest, *see* JA2849.

### B. The Order Exceeds the President's Authority and Violates the Separation of Powers.

In addition to violating the First Amendment, the Order exceeds the President's authority and impermissibly interferes with federal courts' exercise of "[t]he judicial Power." U.S. Const. art. III, §1.

The President's power to issue an executive order "must stem either from an act of Congress or from the Constitution itself." *Minnesota v. Mille Lacs Band of*

*Chippewa Indians*, 526 U.S. 172, 188-89 (1999); *accord Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952).  The Order identifies no statute that empowers the President to sanction a law firm for representing his political opponents or handling lawsuits that he perceives to be contrary to his interests.  The Order finds no support in the President's inherent Article II powers either.  There is no "executive practice, long pursued to the knowledge of the Congress and never before questioned," *Youngstown*, 343 U.S. at 610-11 (Frankfurter, J., concurring), of Presidents using the office to punish lawyers for taking on representations.  No other President has even tried to claim such a power.

The lack of any such power in Article II is unsurprising, as it would "usurp the Judiciary's authority." JA2851.  In our adversarial system, attorneys are "officers of the court," *Ex parte Garland*, 71 U.S. at 378, and courts depend on them to "present all the reasonable and well-grounded arguments necessary for proper resolution of [a] case," *Velazquez*, 531 U.S. at 545.  As the Supreme Court held more than a century ago, attorneys "hold their office during good behavior, and can only be deprived of it for misconduct *ascertained and declared by the judgment of the court* after opportunity to be heard."  *Ex parte Garland*, 71 U.S. at 378 (emphasis added).  Sanctioning attorneys for litigation conduct is thus beyond the power of the political branches and an "exercise of judicial power" reserved to Article III courts.

*Id.* at 378-79; *accord Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017).

"Under the basic concept of separation of powers," the "judicial Power" "can no more be shared with another branch than the Chief Executive, for example, can share with the Judiciary the veto power, or the Congress share with the Judiciary the power to override a Presidential veto." *Stern v. Marshall*, 564 U.S. 462, 483 (2011). The separation of powers thus precludes either Congress or the Executive from attempting to "exclude from litigation those arguments and theories [it] finds unacceptable but which by their nature are within the province of the courts to consider." *Velazquez*, 531 U.S. at 546.

The Order flouts these "accepted separation-of-powers principles" and "threaten[s] severe impairment of the judicial function." *Id.* at 544-46. The imposition of draconian consequences on law firms that challenge executive action has already deterred top firms from handling such challenges. *See supra* pp.8-9. That was the point. The Order thus undermines the rule of law—and the victims include the courts, which will receive less zealous advocacy from lawyers who pull their punches for fear of retribution. This poses a serious threat to the "informed, independent" adversarial presentation on which an "informed, independent judiciary" depends. *Velazquez*, 531 U.S. at 545.

28

To the extent the President believes that a law firm has engaged in improper legal advocacy, he may appeal to the judiciary to make appropriate findings and fashion an appropriate sanction.  JA2853; *see Goodyear*, 581 U.S. at 107.  But the President cannot simply take it upon himself to declare that filings submitted to a coordinate branch of government are so far beyond the pale as to warrant sanction—especially when many of those filings were successful.  JA2853.

In response to these grave separation-of-powers problems, the government offers a single sentence accusing the district court of "ignor[ing] the discretion that the President retains in the areas addressed by the [Order]."  Gov't.Br.54-55.  The court did no such thing.  It *acknowledged* that the President has considerable power over "federal buildings," "security clearances," "federal hiring," and "federal contracts."  JA2851.  But it concluded that "wielding [t]his authority to punish a law firm for engaging in litigation conduct that the President personally disfavors" is not a permissible exercise of that authority, as it "usurps the Judiciary's authority to resolve cases and sanction parties that come before the courts."  JA2851.  The government's failure to say anything challenging this analysis confirms that the district court was spot-on.

## C.    The Order Violates Multiple Other Constitutional Provisions.

In addition to its First Amendment and separation-of-powers claims, WilmerHale sought and obtained summary judgment on claims that the Order

deprives it of protected liberty and property interests without due process, JA2320-22; is void for vagueness, JA2322-23; violates the Equal Protection Clause, JA2323-25; and violates the right to counsel enshrined in the Fifth Amendment, JA2325, and Sixth Amendment, JA2325-27.  Each of these claims provides an independent ground for affirming the judgment below.  Collectively, they underscore the chasm that separates the Order from our constitutional traditions.  WilmerHale adopts its co-appellees' briefing on these issues.  *See* Fed. R. App. P. 28(*i*); Perkins.Br.38-46; Susman.Br.25-29.

## II.    The District Court Properly Enjoined The Entire Order.

Lacking any colorable defense on the merits, the government spends the bulk of its brief urging this Court to pluck certain provisions—particularly §1 and §2(a)—out of the Order and rescue them from invalidation.  That argument fails several times over.  First and foremost, the Order was plainly designed to operate as a unified whole.  That is true both as to §1, the retaliatory glue that holds it together, and as to §2(a), its *en masse* suspension of security clearances.  And even setting severability aside, nothing precludes courts from considering constitutional challenges to the kind of blanket security-clearance suspension at issue here.  While courts are appropriately reluctant to "second-guess the political branches' discretionary judgments about matters of national security," *Lee*, 120 F.4th at 891, this case does not involve any such judgments.  It involves a single act of retaliation against a law

firm for representing clients and causes the President dislikes.  Neither political-question principles nor any other doctrine poses a barrier to holding that the Constitution prohibits retaliatory *en masse* suspension and revocation of security clearances, just as it prohibits retaliatory *en masse* suspension and revocation of other government benefits.

**A.    The District Court Correctly Concluded That the Order Is an Integrated Whole That Must Stand or Fall in Its Entirety.**

Both the Order's plain text and the evidentiary record "indicate that the President intended for the Order to 'embod[y] a single, coherent policy,' designed 'to stand or fall as a whole.'"  JA2875-76; *see also* JA2815-17 & nn.3-4.  Section 1 of the Order makes crystal clear that the punishments imposed by §§2-5 represent an integrated effort to punish WilmerHale for representing clients and causes that the President disfavors and associating with attorneys whom he dislikes, including "Robert Mueller and his colleagues."  JA2332-33.  Indeed, the government has conceded that §1 provides the "explanation for the operational elements of the Executive Order."  D.Ct.Dkt.15-1 at 8;[2] *see also* JA2787-28.  In short, §1 "holds everything together," making the Order a single, retaliatory action.  JA2816-17 & n.4.

---

[2] Citations to the district court docket refer to No. 1:25-cv-00716 (D.D.C.).

31

The President's treatment of Paul Weiss confirms as much.  Like §1 of the WilmerHale Order, §1 of the Paul Weiss order invoked "national security" and announced the President's decision to punish the firm for its advocacy on behalf of disfavored causes and clients and its association with certain attorneys, including a "former leading prosecutor in the office of Special Counsel Robert Mueller." JA2584-85.  The remainder of Paul Weiss order imposed the same punishments as the WilmerHale Order, including a blanket suspension of security clearances, an embargo on "Government goods, property, material, and services," and an EEOC investigation into the firm's hiring practices.  JA2585-86.  When Paul Weiss agreed to change its tune and adopt policies more in line with the President's preferences, however, the President vitiated the earlier order *in toto*, without retaining the suspension of security clearances or any other sanction that could possibly be justified on grounds of national security.  JA2597-98; JA2601-02.  That is proof-positive that these orders are being imposed (and revoked) as a single, unified package.

The government nonetheless argues that §1 is "[]severable" from the rest of the Order and that its "findings," viewed in isolation, are permissible "government speech."  Gov't.Br.60-61.  The district court correctly rejected that claim, recognizing that the findings in §1 are an essential component of "a single, coherent policy," designed "to stand or fall as a whole."  JA2876; *see* JA2815-17.  And the

32

court acted well within its discretion in concluding that the only way to give WilmerHale complete relief is by enjoining all relevant actors from "implementing or giving effect to" the Order, "including by relying on or considering any of the statements in §1."  JA2887.  After all, if federal officials remained free to "take concrete actions based on Section 1," then the firm would be forced to bring (and federal courts would be forced to review) a new lawsuit every time additional retaliation occurred.  *Cf.* Gov't.Br.64.  Contrary to the government's claims, moreover, the district court's injunction does not "tell the President what to say" or "what not to say."  Gov't.Br.1.  The injunction leaves the President free to express his views—and likewise leaves "Cabinet Secretaries … free" to "consider viewpoints" when making appointments to "high-ranking policy making positions."  Gov't.Br.64.  It simply forbids the government from implementing this manifestly unconstitutional Order in any way.  That is entirely appropriate relief.

### B.    The Order's Indiscriminate Blanket Suspension of Security Clearances Is Not Insulated from Judicial Review.

As noted, the government spends most of its brief arguing that the district court was foreclosed from granting any relief as to §2(a)—even though that provision suffers from the same glaring constitutional defects that the court found permeated the rest of the Order—because §2(a) concerns security clearances, a matter that purportedly is foreclosed from any judicial review.  That argument fails at the threshold because of severability principles; there is no need to independently

analyze the constitutionality of §2 because the order is not severable.  JA2875-76.

Indeed, it would be more than passing strange to hold that the Order

unconstitutionally retaliates against WilmerHale—which the Court undoubtedly can

do as to its *other* operative provisions—yet allow §2(a) to stand despite it being fruit

of the same poisonous tree.

At any rate, nothing in *Department of Navy v. Egan*, 484 U.S. 518 (1988), *Lee

v. Garland*, 120 F.4th 880, or any other case compels the conclusion that courts

cannot ever review or grant relief as to any executive action involving security

clearances.  *Contra* Gov't.Br.20-29.  Indeed, no case holds that the entire subject of

security clearances is among the narrow set of "exclusive" executive powers that

"may not be regulated by Congress or reviewed by the courts" at all.  *Cf. Trump v.

United States*, 603 U.S. 593, 621 (2024).  To the contrary, *Lee* expressly recognized

that Congress may "restrict executive discretion in this area."  120 F.4th at 891.  And

this Court has specifically rejected the notion "that all security-clearance decisions

are immune from judicial review."  *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983

F.2d 286, 290 (D.C. Cir. 1993) (Randolph, J.); *see also Rattigan v. Holder*, 689 F.3d

764, 770-71 (D.C. Cir. 2012) (Title VII claim alleging that revocation of individual's

clearance was based on colleagues' "knowingly false reports" was justiciable).

Other courts have held likewise.  *See, e.g., El-Ganayni v. U.S. Dep't of Energy*, 591

34

F.3d 176, 183 (3d Cir. 2010) (claim that clearance was revoked "in retaliation for the exercise of [plaintiff's] First Amendment rights" was justiciable).

Recognizing this, the government concedes that *Egan* and *Lee* hold only that courts may not "review Executive Branch judgments about *whether specific individuals pose a risk to national security*." Gov't.Br.21 (emphasis added). Neither case speaks to reviewability of an effort to prohibit an entire category of unidentified individuals from obtaining or maintaining security clearances, or efforts to change the processes for revoking clearances. And both the Supreme Court and this Court have indicated that plaintiffs *may* challenge those kinds of blanket actions and policy changes. *See Webster v. Doe*, 486 U.S. 592, 603-04 & n.8 (1988) (suggesting that plaintiff could challenge a "general CIA policy against employing homosexuals"); *Doe v. Gates*, 981 F.2d 1316, 1322 (D.C. Cir. 1993) (similar).

As these cases reflect, even in areas where the Executive enjoys "considerable discretion," the Constitution still imposes some constraints. And one is that, just as in virtually all other areas, the Executive may not wield discretion to punish disfavored speech or otherwise violate "the transcendent imperatives of the First Amendment." *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987). Indeed, even when "a person has no 'right' to a valuable governmental benefit," and "the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely." *Perry v. Sindermann*, 408 U.S. 593, 597

(1972).  "It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Id.*

The Supreme Court has applied that rule in a variety of contexts, including government employment, tax exemptions, and unemployment benefits.  *See Rutan v. Republican Party of Ill.*, 497 U.S. 62, 72, 77-78 (1990).  For instance, while "local school boards have broad discretion in the management of school affairs," they "may not remove books from school library shelves" in an effort to "prescribe what shall be orthodox in politics … religion, or other matters of opinion."  *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 863, 869-72 (1982) (plurality).  So too here:  While the President has power to suspend security clearances for many reasons, that does not render courts powerless to act if the President is clearly suspending security clearances on an unconstitutional ground— particularly when (as here) he does so *en masse*, and upends existing procedures in the process.

After all, the animating concern of *Egan* and *Lee* is not that the Executive's power over security clearances must be absolute; it is that courts are ill-equipped "to make nuanced judgments about" the "motivation" for a security-clearance determination, or to second-guess "an assessment of intangible qualities such as 'loyalty to the United States, strength of character, trustworthiness, honesty,

36

reliability, discretion, and sound judgment." *Lee*, 120 F.4th at 893-94. That concern makes sense in the context of a "[p]redictive judgment[]" about a particular individual's suitability for a security clearance, "made by [an official] with the necessary expertise" in protecting classified information. *Id.* at 886 (quoting *Egan*, 484 U.S. at 529); *see also* JA2745-47 (expert report describing process by which such judgments are ordinarily made). It is not implicated, however, when the President simply has not made any such individualized determination, but rather suspends the clearances of an entire group of unidentified individuals undeniably in retaliation for (others') First Amendment-protected activity. That is flatly unlawful, and courts are empowered to prevent it.

C. **The Government's Late-Breaking Argument That the President *Did* Make Individualized Determinations Is Waived and Implausible.**

In an abrupt change of course, the government now suggests that §2(a) is *not* tethered to the findings in §1, and that the President "personally adjudicated the merits of suspending [the relevant] individuals' access to national security information." Gov't.Br.20; *see* Gov't.Br.28, 29-33, 37-38. That directly contradicts what the government argued below, where it asserted that security-clearance suspensions had yet to occur and were not a foregone conclusion because any such suspensions would need to "be done through 'steps consistent with applicable law.'" D.Ct.Dkt.15-1 at 14-15. Indeed, the government told the district court that

WilmerHale attorneys such as military reservists "likely" would *not* lose their clearances if they "had nothing to do with anything that … Section 1 was addressing." JA2396. And the government candidly acknowledged that the President *did not* "take account of" (or even have "knowledge of") individual WilmerHale attorneys' circumstances before he directed the "categorical" suspension of their clearances. D.Ct.Dkt.103 at 6. The government's newly minted contention that the President performed some sort of "merits adjudication," personally "weigh[ing] the risks and benefits of allowing [WilmerHale] employees to access national security information pending further review," Gov't.Br.31, is thus waived. *See, e.g.*, *Keepseagle v. Perdue*, 856 F.3d 1039, 1053-54 (D.C. Cir. 2017).

It also finds no support in the record, which demonstrates that the President ordered blanket security-clearance suspensions to retaliate against law firms he does not like, without identifying the affected individuals or assessing their fitness to hold a clearance. *See supra* pp.4-9. This Court thus need not review any "assessment of intangible qualities such as 'loyalty to the United States, strength of character, trustworthiness, honesty, reliability, discretion, and sound judgment,'" Gov't.Br.26, for a simple reason: No such assessment occurred.

Indeed, the Order does not even purport to find that WilmerHale—let alone any specific WilmerHale attorney—poses a "risk to national security." *Compare* Gov't.Br.21, *with* JA2332-35. As the district court observed, §2 of the Order never

mentions "national security"; it invokes "the broad[er] concept of national interest." JA2831-32. And §2 is plainly "based on" the findings laid out in §1, D.Ct.Dkt.15-1 at 12; *accord* D.Ct.Dkt.15-1 at 6, none of which constitutes the type of national-security determination that *Egan* and *Lee* insulate from review, *see* JA2831-32. Again, the President's rescission of the Paul Weiss order confirms the point: After initially ordering the suspension of Paul Weiss attorneys' clearances *en masse*, the President rescinded the order *in its entirety* just one week later based on the firm's agreement to conduct "client selection," "attorney hiring," and "pro bono" litigation in a manner more in line with those views. JA2601; *see* JA2597-98. None of that has anything to do with national security. And the government's remarkable lack of urgency in prosecuting this appeal and (short-lived) motion to voluntarily dismiss it, *see supra* p.11, is impossible to reconcile with its professed "national security concerns," Gov't.Br.40.

The point is not that the government must use "magic words." Gov't.Br.40. It is that the government must at least *make* the kind of individualized determination that *Egan* and *Lee* insulate from review if it wants a security-clearance determination to be so insulated. And neither law nor logic compels this Court to blind itself to the reality that §2(a) is the product of the same unconstitutional retaliation as the rest of the Order, not individualized national-security assessments. After all, courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of*

*Commerce v. New York*, 588 U.S. 752, 785 (2019). The President's powers in the national-security realm are considerable, but they are not so absolute that courts must stand idly by in the rare instance when a President is plainly exercising them not for national-security reasons, but in retaliation for constitutionally protected activity. Indeed, the government has not identified *any case* holding that a government action was taken in avowed retaliation for First Amendment activity but nevertheless permitting the action to stand in whole or in part. This case should not be the first.

## CONCLUSION

This Court should affirm.

Respectfully submitted,

s/Paul D. Clement
PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MATTHEW D. ROWEN
JOSEPH J. DEMOTT
ILAN J. POSNER
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com

*Counsel for Plaintiff-Appellee*
*Wilmer Cutler Pickering*
*Hale and Dorr LLP*

March 27, 2026

40

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(e), as modified by this Court's order of February 6, 2026, because it contains 8,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(a)(1).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point font.

March 27, 2026

s/Paul D. Clement
Paul D. Clement

**CERTIFICATE OF SERVICE**

I hereby certify that on March 27, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Paul D. Clement</u>
Paul D. Clement