ORAL ARGUMENT SCHEDULED FOR MAY 14, 2026

**Nos. 25-5241, 25-5265, 25-5277, 25-5310**

---

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

PERKINS COIE LLP,
Appellee,
v.
UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
Appellants.

————————

JENNER & BLOCK LLP,
Appellee,
v.
UNITED STATES DEPARTMENT OF JUSTICE, ET AL.,
Appellants.

————————

WILMER CUTLER PICKERING HALE AND DORR LLP,
Appellee,
v.
EXECUTIVE OFFICE OF THE PRESIDENT, ET AL.,
Appellants.

————————

SUSMAN GODFREY LLP,
Appellee,
v.
EXECUTIVE OFFICE OF THE PRESIDENT, ET AL.,
Appellants.

---

On Appeals from the United States District Court for the District of Columbia
Nos. 1:25-cv-00716, 1:25-cv-00916, 1:25-cv-00917, and 1:25-cv-01107

---

## BRIEF OF APPELLEE SUSMAN GODFREY LLP

---

Brad D. Brian
Hailyn J. Chen
Adam B. Weiss
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Fl.
Los Angeles, CA 90071
(213) 683-9100

Donald B. Verrilli, Jr.
Elaine J. Goldenberg
Ginger D. Anders
Jeremy S. Kreisberg
Kyle A. Schneider
Esthena L. Barlow
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Ste. 500E
Washington, DC 20001
(202) 220-1100
Donald.Verrilli@mto.com

*Counsel for Appellee Susman Godfrey LLP*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES AND RULE 26.1 DISCLOSURE

Pursuant to Circuit Rules 26.1 and 28(a)(1), Appellee Susman Godfrey LLP certifies as follows:

### A.     Parties and Amici

References to all parties and amici appearing before the district court and in this Court appear in Appellants' opening brief.

### B.     Rulings Under Review

References to the rulings at issue appear in Appellants' opening brief.

### C.     Related Cases

This case has not previously been before this Court.  The Court has consolidated this case with *Perkins Coie LLP v. U.S. Department of Justice*, No. 25-5241; *Wilmer Cutler Pickering Hale and Dorr LLP v. Executive Office of the President*, No. 25-5277; and *Jenner & Block LLP v. U.S. Department of Justice*, No. 25-5265.  The Court directed that this case be argued on the same day and before the same panel as *Zaid v. Executive Office of the President*, No. 26-5009.

### D.     Rule 26.1 Disclosure

Susman Godfrey LLP is a limited liability partnership with no parent corporation.  No corporation owns 10% or greater ownership interest in Susman Godfrey LLP.

Dated:  March 27, 2026

*/s/ Donald B. Verrilli, Jr.*
Donald B. Verrilli, Jr.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES
AND RULE 26.1 DISCLOSURE ...................................................................i

TABLE OF CONTENTS............................................................................. iii

TABLE OF AUTHORITIES ........................................................................v

GLOSSARY OF ABBREVIATIONS ........................................................ix

INTRODUCTION ........................................................................................1

STATUTES AND REGULATIONS.............................................................3

STATEMENT OF THE CASE.....................................................................3

I.      Factual Background ..........................................................................3

II.     Procedural Background ....................................................................8

STANDARD OF REVIEW .......................................................................10

SUMMARY OF ARGUMENT .................................................................10

ARGUMENT .............................................................................................13

I.      THE DISTRICT COURT CORRECTLY HELD THAT THE ORDER
        IS UNCONSTITUTIONAL ...........................................................13

        A.      The Order Violates the First Amendment...........................13

                1.      The Order Punishes Susman for Its Protected Expression
                        of Disfavored Viewpoints .......................................13

                2.      The Order Violates the Right to Associate and Petition..........23

        B.      The Order Violates the Due Process Clause .......................25

                1.      The Order Blatantly Violates Susman's Right to
                        Procedural Due Process ...........................................25

                2.      The Order Is Unconstitutionally Vague..................28

II.     DEFENDANTS' REMAINING ARGUMENTS FAIL..............................29

        A.      The Order Must Be Analyzed as a Whole .........................29

        B.      Section 1 Must Be Enjoined.................................................31

**TABLE OF CONTENTS**
**(continued)**

**Page**

C.    Susman's Challenges to Sections 3 And 5 Are Justiciable.................34

D.    Section 3 Is Not a Valid Exercise of the Procurement Power ...........38

E.    Section 4 Must Be Enjoined.................................................................39

CONCLUSION.................................................................................................41

Certificate of Compliance ...............................................................................42

Certificate of Service .......................................................................................43

iv

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Al-Nashiri*,
  47 F.4th 820 (D.C. Cir. 2022)............................................................................34

*Al-Saffy v. Vilsack*,
  827 F.3d 85 (D.C. Cir. 2016)............................................................................21

\* *Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021)................................................................................23, 24

\* *Aref v. Lynch*,
  833 F.3d 242 (D.C. Cir. 2016)..............................................................10, 13, 17

*Borough of Duryea v. Guarnieri*,
  564 U.S. 379 (2011)......................................................................................25

*Brady v. Office of Sergeant at Arms*,
  520 F.3d 490 (D.C. Cir. 2008)...........................................................................22

*Chamber of Com. of U.S. v. FEC*,
  69 F.3d 600 (D.C. Cir. 1995)......................................................................37, 40

*Citizens United v. FEC*,
  558 U.S. 310 (2010)......................................................................................14

*Crooks v. Mabus*,
  845 F.3d 412 (D.C. Cir. 2016)...........................................................................27

*eBay v. MercExchange*,
  547 U.S. 388 (2006)......................................................................................10

*Elrod v. Burns*,
  427 U.S. 347 (1976)......................................................................................25

\* Authorities upon which we chiefly rely are marked with asterisks.

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*FCC v. Fox Television Stations*,
    567 U.S. 239 (2012)............................................................26, 28

*FDIC v. Mallen*,
    486 U.S. 230 (1988)....................................................................26

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972)....................................................................29

*Heffernan v. City of Paterson, N.J.*,
    578 U.S. 266 (2016)....................................................................13

*Houston Cmty. Coll. Sys. v. Wilson*,
    595 U.S. 468 (2022)....................................................13, 16, 17

*League of United Latin Am. Citizens v. EOP*,
    780 F. Supp. 3d 135 (D.D.C. 2025)............................................30

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016).........................................................34

\* *Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001)....................................................11, 14, 18

*Logan v. Zimmerman Brush*,
    455 U.S. 422 (1982)....................................................................25

*McCutcheon v. FEC*,
    572 U.S. 185 (2014)....................................................................14

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
    526 U.S. 172 (1999)....................................................................29

*Morrison v. Olson*,
    487 U.S. 654 (1988)....................................................................15

vi

## TABLE OF AUTHORITIES
## (continued)

<strong>Page(s)</strong>

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
  429 U.S. 274 (1977)..................................................................22

*N. Am.'s Bldg. Trades Unions v. DOD*,
  783 F. Supp. 3d 290 (D.D.C. 2025).........................................32

*NAACP v. Button*,
  371 U.S. 415 (1963)..................................................................19

*Neb. Press Ass'n v. Stuart*,
  427 U.S. 539 (1976)..................................................................18

* *NRA v. Vullo*,
  602 U.S. 175 (2024)........................... 2, 11, 13, 17, 18, 21, 32

* *O'Donnell v. Barry*,
  148 F.3d 1126 (D.C. Cir. 1998).........................................25, 27

*In re Primus*,
  436 U.S. 412 (1978)..................................................................19

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
  758 F.3d 296 (D.C. Cir. 2014)..................................................28

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)..................................................................18

*Schware v. Bd. of Bar Exam'rs*,
  353 U.S. 232 (1957)..................................................................25

*Seila Law v. CFPB*,
  591 U.S. 197 (2020)..................................................................30

*Sorrell v. IMS Health*,
  564 U.S. 552 (2011)..................................................................18

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Taylor v. Resolution Tr.*,
  56 F.3d 1497 (D.C. Cir. 1995)................................................................27

*Ukrainian-Am. Bar Ass'n v. Baker*,
  893 F.2d 1374 (D.C. Cir. 1990)..............................................................14

*United States v. Williams*,
  553 U.S. 285 (2008).................................................................................28

*USAID v. Alliance for Open Soc'y Int'l*,
  570 U.S. 205 (2013).................................................................................24

*Whitney v. California*,
  274 U.S. 357 (1927)...................................................................................2

* *Wisconsin v. Constantineau*,
  400 U.S. 433 (1971).........................................................................26, 31

STATE CASES

*US Dominion v. Newsmax Media*,
  2025 WL 1092289 (Del. Super. Ct. Apr. 9, 2025) .................................4

FEDERAL RULES

Fed. R. App. P. 28(i) .................................................................................11

FEDERAL REGULATIONS

Executive Order 14173, 90 Fed. Reg. 8633 (Jan. 21, 2025)...................38

* Executive Order 14263, 90 Fed. Reg. 15615 (Apr. 9, 2025)................4

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| EEOC | Equal Employment Opportunity Commission |
| DOJ | Department of Justice |
| GLAD | GLBTQ Legal Advocates and Defenders |
| NRA | National Rifle Association |
| Order | Executive Order 14263 (April 9, 2025) |
| TRO | Temporary Restraining Order |

**INTRODUCTION**

President Trump's Executive Order attacking Susman Godfrey (the "Order") constitutes a grave abuse of presidential power that threatens the essential postulates of our Constitution and the rule of law itself. The Order purports to subject Susman to punishing disabilities that would make it impossible for the Firm to conduct a law practice that zealously advances its clients' interests. The undisputed factual record establishes that the President singled out Susman for those punishments because of the Firm's *speech*: because the Firm successfully advocated in court for Dominion Voting Systems and for state officials defending the integrity of the 2020 presidential election; because the Firm made a charitable contribution to an organization promoting gay and lesbian equality; and because the Firm is committed to the principles that women and men should receive equal pay for equal work, and that opportunities in the legal profession should be equally available to all irrespective of race, religion, gender, or national origin.

Like the other executive orders now before the Court, the Order violates the First Amendment many times over. It is unconstitutionally retaliatory; it is odious viewpoint discrimination; it disrupts Susman's right to associate with its clients; and it denies Susman the right to petition the courts for redress of grievances. Indeed, its objectives are especially pernicious. Its very point is to prevent courts from hearing the best arguments from the best lawyers challenging Executive actions, to

1

shut down challenges puncturing the myth that the 2020 election was rigged, and more broadly to intimidate not just Susman but the entire legal profession from disseminating ideas that the President finds anathema. The Order thus aims at nothing short of "silence coerced by law—the argument of force in its worst form." *Whitney v. California*, 274 U.S. 357, 376 (1927) (Brandeis, J., concurring). But Presidents are not exempt from the bedrock First Amendment principle that "[g]overnment officials cannot attempt to coerce private parties in order to punish or suppress views that the government disfavors." *NRA v. Vullo*, 602 U.S. 175, 180 (2024). And at the same time, the Order is as blatant a violation of due process as one could imagine. Susman was afforded no notice or opportunity whatsoever to contest the factual and legal bases for the Order's crippling sanctions.

Defendants barely defend the Order's brazen unconstitutionality, offering only halfhearted technical objections to the district court's ruling. In fact, as this Court knows, Defendants initially dropped their appeal altogether, only to reverse course without offering Susman or this Court any explanation.

Were the Order to stand, Susman's lawyers would effectively be under the thumb of the President, forced to submit to his whims regardless of their own sense of duty to the Constitution, their clients, and the rule of law. Today, it is Susman. Tomorrow, it could be any law firm or lawyer. The Framers included the guarantees

of the First Amendment and the Due Process Clause in the Constitution precisely for moments like this one.

The district court was thus correct in every respect in enforcing those guarantees to enjoin the Order in its entirety.  This Court should affirm.

## STATUTES AND REGULATIONS

Pertinent legal provisions are listed in the addendum to Defendants-Appellants' brief.

## STATEMENT OF THE CASE

### I.    Factual Background

A.  Susman Godfrey is a preeminent trial firm that employs over 230 attorneys in Houston, Los Angeles, New York, and Seattle and "specializes" in practice areas "requir[ing] frequent interaction with the federal government."  JA3483.  When this case began, Susman had hundreds of active matters before federal courts and agencies that entailed trials and other in-person federal-court appearances.  *Id.* Those matters involved "frequent" meetings with government personnel and work for numerous "clients that either contract or do business with the federal government or have affiliates that are government contractors and subcontractors."  *Id.*

Susman does not shy away from controversial legal work or from taking on powerful institutions.  For instance, Susman represented various State officers in defending the integrity of the 2020 election.  JA3485.  Susman represented

3

Dominion Voting Systems in defamation actions against Fox for false statements relating to that election, JA3485 & n.2, obtaining a historic $787.5 million settlement in 2023, JA3158-JA3164.  And Susman represented Dominion in a defamation action against Newsmax Media in which, just hours before the Order issued, a trial court ruled that Newsmax had made false and defamatory statements about that election and Dominion.  *US Dominion v. Newsmax Media*, 2025 WL 1092289, at *12-17 (Del. Super. Ct. Apr. 9, 2025).

B.  On April 9, 2025, President Trump issued Executive Order 14263, titled "Addressing Risks From Susman Godfrey," along with an accompanying "Fact Sheet."  90 Fed. Reg. 15615 (Apr. 9, 2025); *see* JA3150-JA3151.  President Trump announced the Executive Order and signed it on live television.  JA3522.  Susman was given neither advance notice nor any opportunity to respond.  JA3488.

Section 1 of the Order announces that "action is necessary to address the significant risks, egregious conduct, and conflicts of interest associated with Susman Godfrey LLP," and goes on to enumerate the purported reasons why.  A11.  Section 1 accuses Susman of "spearhead[ing] efforts to weaponize the American legal system and degrade the quality of American elections" and "fund[ing] groups that engage in dangerous efforts to undermine the effectiveness of the United States military through the injection of political and radical ideology."  *Id*.  Section 1 also alleges that Susman "supports efforts to discriminate on the basis of race" and "itself

4

engages in unlawful discrimination," including by "administer[ing] a program where it offers financial awards and employment opportunities only to 'students of color.'" *Id.* The "Fact Sheet" echoes those allegations, branding Susman a "rogue law firm[]." JA3150.

The Order provides no factual support for most of its myriad accusations. But Defendants "agree[d]" below that Section 1's election-related allegations refer solely "to Susman's representation of Dominion Voting Systems and government officials in Arizona and Wisconsin in connection with litigation regarding the 2020 election." JA3507. Defendants also "agree[d]" that Section 1's statement about the military refers solely "to Susman's decision to donate funds to 'GLBTQ Legal Advocates and Defenders (GLAD)," an organization that "previously sued the Federal Government to enjoin [a] Department of Defense policy.'" JA3485, JA3507 (quoting ECF No. 159 at 13 n.2). And Defendants "agree[d]" that Section 1's statement about a program for students of color refers to the "Susman Godfrey Prize," which "does not include an offer of employment" and, as Defendants eventually conceded, is "not an example of unlawful racial discrimination." JA3508.

Section 2 implements Section 1's directive to take "action" by requiring the Attorney General and other agency heads to "immediately take steps consistent with applicable law to suspend any active security clearances held by individuals at Susman, pending a review of whether such clearances are consistent with the

5

national interest." A12.  It also instructs agencies to "expeditiously cease" providing any "Government goods, property, material, and services, including Sensitive Compartmented Information Facilities," for Susman's "benefit."  *Id.*

Section 3 implements Section 1's directive by disrupting Susman's relationships with government contractors.  It directs agencies to "require Government contractors to disclose any business they do with Susman and whether that business is related to the subject of the Government contract."  A12.  It further directs agencies to "take appropriate steps to terminate any contract ... for which Susman has been hired" by a contractor or by the government "to perform any service" and to "otherwise align their agency funding decisions" with the Administration's "goals and priorities."  *Id.*; *see* JA3150 ("Federal Government will terminate contracts that involve Susman").

Section 4 implements Section 1's directive by attacking Susman's employment actions.  It provides that "nothing in this order shall be construed to limit" language in the Perkins Coie order directing the EEOC Chair to review and the Attorney General to investigate law firms' employment practices. A13.  And the Fact Sheet states that "[t]he practices of Susman will be reviewed under Title VII." JA3150.

Section 5 implements Section 1's directive by restricting Susman personnel's access to federal buildings, officials, and employment opportunities.  It directs

agencies to "provide guidance limiting official access from Federal Government buildings to employees of Susman when such access would threaten the national security of or otherwise be inconsistent with the interests of the United States." A13. It requires agencies to "provide guidance limiting Government employees acting in their official capacity from engaging with Susman employees to ensure consistency with the national security" and "other [U.S.] interests." *Id.*  And it instructs agency officials to "refrain from hiring employees of Susman." *Id.*; *see* JA3150.

C.  In the weeks preceding the Susman Order, the President issued a series of executive orders and memoranda attacking other law firms. *E.g.*, A1-A4 (Perkins Coie); A5-A7 (Jenner & Block); A8-A11 (WilmerHale); JA1953-JA1954 (Covington).  One such firm, Paul, Weiss, "negotiated a deal," obtaining rescission of the executive action after promising the President "millions of dollars" in "pro bono" services. JA3490 n.5.  Eight law firms—including Skadden and Kirkland & Ellis—avoided the crushing harms that a possible order would impose by peremptorily promising "to provid[e] hundreds of millions of dollars in pro bono work on initiatives supported by President Trump." JA3490-JA3491.

Four firms, including Susman, held their ground and challenged the orders in court.  All four obtained permanent injunctions.  JA3482; JA1628 (Perkins Coie); JA2157 (Jenner & Block); JA2804 (WilmerHale).

7

## II.    Procedural Background

Susman filed this suit on April 11, 2025, challenging the entire Order.  The Firm sought, and the district court granted, a TRO as to Sections 1, 3, and 5 (which the court extended until final judgment).  JA2990-JA2992, JA3067-JA3068; *see* JA3362.

The district court granted summary judgment for Susman.  The court ruled that the Order contravenes the First Amendment by retaliating on the basis of protected speech, discriminating based on viewpoint, abridging freedom of association, and violating the Petition Clause—all without a shred of evidence that Susman has engaged in any unlawful, problematic, or national-security-undermining action.  JA3505-JA3519.  "Whether the executive is operating as a sovereign, contractor, landlord, or employer," the court emphasized, "retaliatory intent" is not "immunize[d]."  JA3511.  The court ruled that the Order violates the Fifth Amendment because it violates Susman's right to procedural due process and equal protection of the laws, is unconstitutionally vague, and violates the right to counsel. JA3519-JA3527.  Finally, the court ruled that the Order "does not draw on an executive power that has been designated to the President by the Constitution or statute" and "improperly seizes authority that the Constitution grants to the judiciary." JA3529.

8

Defendants adduced no evidence at summary judgment to support the Order's accusations. Instead, Defendants contended that the court should not reach any constitutional issues. The court rejected those arguments. JA3496. The court explained that "Susman is not asking the court to muzzl[e] the Executive by enjoining the President's speech," but instead "ask[ing] the court to enjoin Defendants from implementing or giving effect to the Order," which has "coerc[ive]" effect. JA3498 (citations omitted). The court deemed "the blanket suspension of security clearances under Section 2" to be "judicially reviewable," because it did not involve any "discretionary judgment about an individual." JA3498-JA3500. And the court concluded that Susman had standing and that its challenge to the Order was ripe, including because the Order required immediate suspension of clearances and government hiring of Susman employees and was damaging Susman's reputation and "chilling [Susman's] current and prospective attorney-client relationships in the here-and-now." JA3501-JA3504.

The district court granted Susman a "permanent injunction" and "declaratory relief." JA3529. The court concluded that Susman was irreparably harmed because it "suffered constitutional violations," "reputational harms that are not monetarily reparable," and significant unrecoverable "monetary harm." JA3530-JA3531. The court also concluded that the "balance of the equities and the public interest squarely favor" the injunction. JA3531-JA3533.

9

After Defendants appealed in all four law-firm cases, this Court consolidated the appeals and ordered each firm to "adopt relevant portions of each other's briefs." Feb. 6, 2026 Order at 3.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment de novo," *Aref v. Lynch*, 833 F.3d 242, 250 (D.C. Cir. 2016), and its grant of permanent injunctive relief for "abuse of discretion," *eBay v. MercExchange*, 547 U.S. 388, 391 (2006).

## SUMMARY OF ARGUMENT

The Order punishes Susman for advocacy on behalf of clients and causes that have drawn the President's ire. That unprecedented and brazen effort to penalize attorneys for advocating on behalf of clients and petitioning the courts violates the First Amendment, the Fifth Amendment, and the separation of powers. The Bill of Rights and overall design of our Constitution were adopted in large measure to ensure that no president could abuse the weighty power of the presidency as this President seeks to do.

In this brief, Susman explains why the district court correctly held that the Order violates Susman's rights under the First Amendment and the Fifth Amendment's Due Process Clause. Because the Order's implementing provisions are materially identical to those in the executive orders issued to the other appellee

10

law firms, Susman adopts and incorporates by reference the arguments made by other appellees concerning the executive orders' violation of the due process right to counsel, the right to equal protection, and the separation of powers. Perkins.Br.41-46; Wilmer.Br.26-29; *see* Fed. R. App. P. 28(i). The district court correctly held that the Order against Susman is unconstitutional on those additional grounds as well. JA3525-JA3528. In addition, Susman incorporates by reference Jenner and Wilmer's arguments that Section 2, which requires suspension of the security clearances held by employees of the firms, is unconstitutional and that challenges to its unconstitutionality are justiciable, as the district court correctly held here. Jenner.Br.34-43; Wilmer.Br.33-40.

I. The district court correctly held that the Order violates the First Amendment by retaliating for protected advocacy with which the President takes issue, most notably Susman's representation of Dominion Voting Systems and state election officials in litigation defending the integrity of the 2020 presidential election. *See NRA v. Vullo*, 602 U.S. 175, 188 (2024); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 546-48 (2001). The Order identifies Susman's protected advocacy of disfavored viewpoints as the very reason why "action is necessary" and then imposes a raft of draconian penalties, including immediately suspending all Susman security clearances, requiring all Susman clients with government contracts to disclose their relationship with Susman so that federal agencies may terminate those contracts, and

11

directing federal officials to restrict Susman's access to federal buildings and employees. By imposing those penalties, the Order also violates Susman's protected associational and petitioning rights, and it deprives Susman of its protected liberty and property interests without due process.

The district court therefore rightly granted summary judgment to Susman, and it acted well within its discretion in imposing permanent injunctive relief—indeed, Defendants do not even challenge the district court's findings concerning irreparable harm and the other equitable injunction factors.

II. Defendants' primary strategy is to address each of the Order's provisions in isolation while ignoring the undeniable import of the Order as a whole. That strategy fails at every level. The Order works as an integrated whole to punish Susman for its advocacy: *every* provision is motivated by unconstitutional retaliatory intent. Defendants' smattering of procedural and technical defenses concerning individual provisions fares no better. Section 1 must be enjoined with the rest of the Order; Susman's challenges to Sections 3 and 5 are ripe; Section 3 cannot be defended as a valid exercise of the procurement power; and Section 4 unconstitutionally singles out Susman for a retaliatory EEOC investigation and therefore must be enjoined.

12

# ARGUMENT

## I. THE DISTRICT COURT CORRECTLY HELD THAT THE ORDER IS UNCONSTITUTIONAL

The district court correctly concluded that the Order is unconstitutional in myriad ways. Rather than confronting those conclusions, Defendants advance a section-by-section defense that seeks to avoid the merits, ignores the record, and fails to provide any basis for disturbing the district court's decision.

### A. The Order Violates the First Amendment

#### 1. *The Order Punishes Susman for Its Protected Expression of Disfavored Viewpoints*

a. It is bedrock law that government officials may not "use the power of the State to punish or suppress disfavored expression" or perceived viewpoint. *Vullo*, 602 U.S. at 188-89; *see, e.g.*, *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022); *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 272-73 (2016). Unconstitutional retaliation occurs when (1) a plaintiff "engaged in conduct protected under the First Amendment"; (2) there is "a causal link between the exercise of a constitutional right" and "adverse" government action; and (3) the adverse action is "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258 (citation omitted). As the district court correctly held, that test is amply satisfied here. JA3516.

13

First, as Defendants conceded below, Susman's advocacy for its clients and for causes the Firm supports are precisely what drew the President's ire—and that advocacy is unquestionably protected speech. Defendants "agree[d]" that the Order's reference to "degrad[ing] the quality of American elections" refers to "Susman's representation of Dominion Voting Systems and government officials in Arizona and Wisconsin" in defending the integrity of the 2020 election. JA3506-JA3507. Defendants also agreed that the Order's allegation of funding "dangerous" groups that have "undermine[d]" military readiness "refers to Susman's decision to donate funds to [GLAD]," an organization that "previously sued the Federal Government to enjoin [a] Department of Defense policy." JA3485, JA3507 (quoting government's brief). And Defendants agreed that the Order's accusation of "unlawful discrimination" refers to a "statement on [Susman's] website describing diversity as 'one of the firm's core values'" and to the Susman Godfrey Prize, which is given to law students of color and which Defendants conceded is entirely lawful. JA3508; *see* pp. 21-22, *infra*.

Those activities are at the very core of what the First Amendment protects. Susman's "representation" of Dominion Voting and elections officials in petitioning the courts is "protected First Amendment activity," as "[i]t is well established that 'advice from [an] attorney to [a] client and ... advocacy by the attorney to the courts'" falls within the First Amendment's protections. JA3507 (quoting *Velazquez*, 531

14

U.S. at 542-43); *see Ukrainian-Am. Bar Ass'n v. Baker*, 893 F.2d 1374, 1380 (D.C. Cir. 1990). Susman's donations to political or legal causes are likewise constitutionally protected—including when those causes are disfavored by the President or the Executive Branch. JA3507 (citing *Citizens United v. FEC*, 558 U.S. 310, 342-43 (2010)); *see McCutcheon v. FEC*, 572 U.S. 185, 191 (2014). And Susman's endorsement of diversity is "speech plainly protected by the First Amendment." JA3508-JA3509.

Second, it is equally plain that the Order punishes Susman *because of* its protected expression. Indeed, this is the rare retaliation case in which the wolf comes as a wolf. *Cf. Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting). The Order unabashedly trains the might of the Executive Branch on Susman because of its advocacy defending the integrity of the 2020 election—a position that the President has made quite clear he cannot abide. A11; JA3506-JA3507. The Order further explains that "[t]hose who engage in blatant discrimination and other activities inconsistent with the interests of the United States should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds." A11. The Order then operationalizes those overarching directives by imposing draconian punishments that, among other things, limit Susman attorneys' "access to our Nation's secrets," direct federal officials to terminate government contracts with Susman and its clients, restrict Susman's access to government personnel and

buildings, and institute a Title VII investigation. A11-A13. All told, as the district court concluded, the Order's "stated reasons for enactment all hinge on Susman's protected speech." JA3511.

Context eliminates any doubt. The Order is one of several targeting firms that have represented the President's perceived opponents. Each order is equally upfront about its retaliatory nature. A1-A2, A5-A6, A8-A9. And the President's rescission of the Paul, Weiss Order based on a compelled acknowledgement of wrongdoing underscores the link between the orders and law-firm advocacy. JA3512-JA3513; Gov.Br.14. The "settlement" makes crystal clear that the orders' punishments targeted legal advocacy and other speech that the government disfavors.

Third, the Order imposes devastating consequences that obviously aim not merely to punish Susman but also to deter the Firm from comparable future advocacy, and that have in fact chilled the advocacy of other similar firms. *See Hous. Cmty. Coll.*, 595 U.S. at 477. The Order brands Susman an enemy engaged in "activities inconsistent with the interests of the United States." A11. By immediately suspending Susman's security clearances, A12, the Order tars Susman's reputation and renders the Firm unable to represent clients in matters involving classified information. The Order endeavors to drive away Susman's clients by directing all agencies to "assess[]" government contracts with *any* Susman clients and "align their agency funding decisions with the interests of the citizens of

16

the United States"—thus threatening clients with the loss of government contracts merely because they retained Susman to represent them. *Id.* The Order hamstrings Susman's ability to engage with federal employees—a necessary feature of Susman's client representations. And the Order directs agencies to deny Susman's access to federal buildings, imperiling its lawyers' ability to appear in federal courts, and directs a spurious employment-discrimination investigation, further harming Susman's reputation. A13. Those punishments obviously will—if allowed to take effect—damage Susman's business prospects, disrupt its client relations and ability to attract new clients, and impede its lawyers' ability to zealously advocate. Indeed, that is the Order's avowed purpose.

As the district court observed, the Order's obvious chilling effect is confirmed "by the efforts of several other peer law firms to avoid precisely the consequences" imposed by the orders. JA3509. "Instead of suffering the financial and reputational consequences of that order, Paul Weiss negotiated a deal with the Trump Administration." *Id.* And "rather than risk being targeted by President Trump, several other reputable firms negotiated agreements with the White House." JA3510. Those actions by other firms provide unusually direct evidence that the Order's punitive provisions are "sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again." *Aref*, 833 F.3d at 258. That conclusion is further reinforced by the fact that the actions were taken *by the President*. *See Vullo*,

17

602 U.S. at 191 ("The power that a government official wields … is relevant to … whether a reasonable person would perceive the official's communication as coercive.").

In sum, as the district court held, the Order is textbook "unlawful retaliation against Susman for activities that are protected by the First Amendment."  JA3516.

b.  For similar reasons, the district court also correctly concluded that the Order unconstitutionally discriminates against Susman for the viewpoints it expressed.  JA3026.  It could hardly be more obvious that viewpoint discrimination animates the entire Order.

Viewpoint discrimination is subject to strict scrutiny because it is "uniquely harmful to a free and democratic society."  *Vullo*, 602 U.S. at 187; *see Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015).  As the Supreme Court has unambiguously held, that principle applies with particular force to legal advocacy in order to ensure that the judiciary can play its constitutionally assigned role:  "[a]n informed, independent judiciary presumes an informed, independent bar."  *Velazquez*, 531 U.S. at 545-47 (holding unlawful an attempt to "prohibit" certain "advice or argumentation" by lawyers and explaining that the restriction "threatens severe impairment of the judicial function").

The Order cannot survive strict scrutiny.  "[I]t is all but dispositive to conclude that a law is … viewpoint discriminatory."  *Sorrell v. IMS Health*, 564 U.S. 552, 571

18

(2011). Defendants cannot demonstrate a compelling interest. JA3519. There is no compelling interest in punishing lawyers who advocated for their clients. If anything, there is a compelling interest in the opposite: zealous, unfettered ethical representation of those disfavored by the government is a cornerstone of our constitutional democracy and the rule of law itself. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 547 (1976) (Bill of Rights was drafted by those "familiar with the historic episode in which John Adams defended British soldiers charged with homicide for firing into a crowd of Boston demonstrators"); *NAACP v. Button*, 371 U.S. 415, 440 (1963). There also is no conceivable legitimate interest in preventing Susman from donating to advocacy groups with which the Executive Branch disagrees or engaging in lawful diversity-promoting initiatives. Indeed, Defendants do not even attempt to respond to the district court's conclusion that, aside from punishing "Susman's protected speech," "nothing in the Order or its accompanying fact sheet suggests that there is any other governmental interest that may be served if the Order is permitted to take effect." JA3511.

Finally, far from being narrowly tailored, the Order lacks "[p]recision of regulation," which is fatal "[w]here political expression or association is at issue." *In re Primus*, 436 U.S. 412, 432, 434 (1978) (citation omitted). For example, the Order threatens the termination of *all* government contracts held by any clients of Susman. A12. And it sweeps so broadly as to potentially bar Susman employees

from all federal buildings—including "courthouses, Post Offices, the VA hospital and beyond." JA3039; A13.

c. Defendants barely take on the district court's conclusion that the Order unconstitutionally punishes Susman for its protected speech, raising only two meritless responses.

First, in an apparent attempt to cleave Section 1's statements from the retaliation analysis, Defendants downplay them as "government speech." Gov.Br.61. But Section 1 is no mere presidential musing. It is the linchpin of an *executive order*, and it declares official governmental findings and conclusions that imbue each provision of the Order with its operative effect. Section 1 announces that "*action is necessary* to address the significant risks, egregious conduct, and conflicts of interest associated with Susman," and makes several defamatory assertions to the effect that Susman's protected advocacy is "detrimental to critical American interests." A11 (emphasis added). Section 3 then implements the instruction to take "action" by directing agencies to terminate contracts involving Susman or its clients in a manner that is "aligned with American interests," A12, and the other sections similarly effectuate Section 1's false accusations of racial discrimination and conduct undermining national interests. A12-A13. At bottom, the President's statements in the Order dictate not only *what* punishments his

20

subordinates must inflict on Susman, but also *why* the President ordered those punishments.

*Vullo* forecloses Defendants' effort to treat Section 1's statements as government speech hermetically sealed from the First Amendment inquiry.  There, the Court explained that "[a] government official can share h[is] views freely and criticize particular beliefs, and []he can do so forcefully in the hopes of persuading others to follow h[is] lead."  602 U.S. at 188.  "What []he cannot do, however, is use the power of the State to punish or suppress disfavored expression."  *Id.*  The unanimous Court emphatically rejected the government official's effort to characterize criticism of the NRA as "permissible government speech," reasoning that doing so would improperly treat that speech "in isolation" from the official's threat to punish companies for associating with the NRA.  *Id*. at 194-95.  That reasoning governs here, where the statements that Defendants pooh-pooh as mere speech are the operative predicates for the Order's punishments.

Second, Defendants make the extraordinary assertion that "much of the conduct" identified in the Order is "unprotected."  Gov.Br.52.  But as relevant to Susman, they identify as "unprotected" conduct only the purported "racial discrimination" in employment on which the Order relies.  *Id*.  That accusation is false—as the district court held on the basis of undisputed facts.  JA3509 (finding "no evidence" of unlawful discrimination).  As the court explained, the Order's

21

accusation of unlawful discrimination rested primarily on the Susman Godfrey Prize, which government counsel was forced to "*agree*[]" was an entirely lawful mentoring program not covered by federal employment laws. JA3508 (emphasis added); *see Al-Saffy v. Vilsack*, 827 F.3d 85, 96 (D.C. Cir. 2016). Defendants never produced even a single additional example of purportedly discriminatory conduct. As the court put it, Defendants "appear[ed] to take issue" with Susman's statements of support for the idea that women and men should receive equal pay for equal work, but under questioning government counsel conceded that "increasing parity … [and] pay[ing] people that do the same work[] similar salaries wouldn't be objectionable." JA3508-JA3509 (citation modified). Rather than challenge those findings here, Defendants ignore them. But they foreclose Defendants' contention that the Order's punishments were imposed in retaliation for "unprotected" conduct.[1]

Even if Defendants could plausibly allege discrimination—which they could not, JA3509—that would not cleanse the Order of its unconstitutionally retaliatory

---

[1] Defendants assert that "[a]ny doubts about whether [Susman] engaged in illegal racial discrimination are irrelevant," citing a Title VII case stating that the "issue" was "whether *the employer honestly and reasonably believed* that the underlying" facts leading to the employment decision occurred. Gov.Br.53; *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 496 (D.C. Cir. 2008). But any purported "belief" that Susman engaged in discrimination could not have been "reasonable" for the reasons discussed above. And whatever the President "believed" with respect to whether Susman engaged in discrimination, Defendants do not suggest that the President believed the Order's *other* asserted justifications were not protected speech.

purpose. The Order indisputably imposes its punishments based principally on advocacy protected by the First Amendment. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). To establish that the Order was nonetheless constitutional, defendants would have to demonstrate that the President would have issued the Order even in the absence of Susman's advocacy defending the 2020 election and its protected charitable donations. *See id.* Defendants have not even tried to do so, and any such argument would be implausible. After all, Defendants have conceded that the Order's security-clearance, contracting, and government-building provisions penalize Susman for its purported "efforts to … degrade the quality of American elections" and "fund[ing]" of "groups that engage in dangerous efforts," A11—that is, for its protected speech.

### 2.    *The Order Violates the Right to Associate and Petition*

The district court also correctly concluded that the Order violates Susman's First Amendment freedom of association and right to petition.

a. The Order's demand that government contractors "disclose any business they do with Susman" and its concomitant threats of reprisal against "entities that do business with Susman" violate Susman's freedom of association. A12. As the White House Fact Sheet explains, the Order's threats against contractors that work with Susman are broad and severe: the Order is meant to "ensure taxpayer dollars no longer go to contractors whose earnings subsidize activities not aligned with

American interests," JA3150, including, according to Section 1, activities like advocacy work by Susman, A11.  That is a bare-knuckled threat of reprisal against contractors that have chosen Susman as their lawyers.  The Order's compelled disclosure of "affiliation with" Susman plainly chills further association with the Firm, triggering exacting scrutiny.  *See Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607, 616 (2021); JA3517 (district court applying such scrutiny).

Defendants resist that conclusion on the ground that "contractors are already subject to substantial disclosure requirements." Gov.Br.57.  But none carries severe economic consequences for retaining a law firm that the President disfavors.  Defendants also assert that Susman is not "engaged in any expressive association" in this context.  Gov.Br.57.  But that is obviously false, because Susman's advocacy activities—which are the basis for both the disclosure the Order compels and the punishments the Order directs—are firmly protected by the First Amendment.  *See* pp. 14-15, *supra*.

Defendants' desultory effort to satisfy exacting scrutiny also falls short.  Gov.Br.57.  The governmental interest underlying the Order—deterring law firms from representing clients who take positions that the President dislikes—is not even legitimate, let alone "sufficiently important" to satisfy exacting scrutiny.  *Bonta*, 594 U.S. at 607; *see* JA3517.  And forced "disclos[ure]" of "*any* business [contractors] do with Susman" and "whether that business is related to *the subject* of the

24

Government contract," A12 (emphasis added), is obviously not narrowly tailored. *See USAID v. Alliance for Open Soc'y Int'l*, 570 U.S. 205, 214-15 (2013). As the district court explained, the disclosure requirement applies even if the contractor's business with the government "has nothing to do with the firm." JA3517.

b. The Order also violates the Petition Clause, which "protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). As the district court concluded, the Order burdens that right by punishing Susman for its past petitioning activity and threatening Susman's ability to petition federal employees, federal agencies, and federal courts on behalf of its clients. JA3518. "[E]xacting scrutiny" applies here as well. *Elrod v. Burns*, 427 U.S. 347, 362 (1976); *see* JA3518. Yet Defendants offer no justification whatsoever for the Order's petitioning restrictions.

## B. The Order Violates the Due Process Clause

### 1. *The Order Blatantly Violates Susman's Right to Procedural Due Process*

The Due Process Clause is violated when the plaintiff (1) faces a deprivation of a protected liberty or property interest without (2) the process that is due. *See Logan v. Zimmerman Brush*, 455 U.S. 422, 428 (1982). As the district court correctly ruled, Susman readily satisfies that test.

a. The Order deprives Susman of numerous interests that the Due Process

Clause protects. The Order interferes with Susman attorneys' constitutionally protected interest in practicing law. *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238 (1957). The Government cannot exclude a person from their chosen occupation—including government employment or work on government contracts—without procedural safeguards. *O'Donnell v. Barry*, 148 F.3d 1126, 1141 (D.C. Cir. 1998). Yet the Order formally excludes Susman and its employees from both federal employment and government contracts. A12-A13. And it impedes Susman attorneys' legal careers by driving away clients and preventing Firm attorneys from engaging in conduct indispensable to the practice of law. *See* pp. 16-17, *supra*.

The Order also deprives Susman of its constitutionally protected "good name" and "reputation." *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971); *see* JA3521; *FCC v. Fox Television Stations*, 567 U.S. 239, 255-56 (2012) ("findings of wrongdoing" that "could have an adverse impact on [an entity's] reputation" must be issued in accordance with due process). The Order repeatedly smears the Firm, falsely accusing Susman of conduct contrary to American interests, claiming that the Firm cannot be trusted with government work, access, or information, and making a series of stigmatizing mischaracterizations about the purportedly "egregious" nature of Susman's behavior. A11-A13. That creates the prospect of wide-reaching reputational damage, including as to potential jurors and others who may read

26

reports of the Order.

Finally, the Order interferes with Susman's property interest in contracts with its clients. *See FDIC v. Mallen*, 486 U.S. 230, 240 (1988). As explained, the Order punishes Susman's clients for retaining the Firm. A12-A13. By "attach[ing] a penalty to Susman's representation," the Order violates the Firm's contracting interests. JA3521-JA3522.

For the first time on appeal, Defendants contest Susman's showing of protected liberty and property interests, arguing that the "impacts" on its client relationships are "nebulous" and that the Order does not "formally" "exclude[] anyone from working as an attorney." Gov.Br.56. Defendants never made that argument below, and it is therefore forfeited. *See Crooks v. Mabus*, 845 F.3d 412, 423 (D.C. Cir. 2016). In all events, government action need not formally preclude a plaintiff from pursuing his chosen profession in order to "infringe[] a liberty interest." *O'Donnell*, 148 F.3d at 1141. The challenged action need only "seriously affect" that ability or "substantially reduc[e] the value of [the plaintiff's] human capital." *Id.* (citation omitted); *see Taylor v. Resolution Tr.*, 56 F.3d 1497, 1506 (D.C. Cir. 1995). The Order unquestionably does that. As the district court concluded, the Order's directions that the government terminate contracts with Susman clients and that Susman be barred from government buildings have a "preclusive effect" on Susman's practice of law. JA3520-JA3521. And the Order's

false and "salacious allegations of wrongdoing" are "particularly" harmful given the legal profession's requirement of "honor and integrity."  JA3521.

b.  Susman indisputably received no process whatsoever—and Defendants have not argued otherwise.  Susman first learned of the Order's accusations when the President issued the Order on live television.  As the district court concluded, the Firm was not given any chance to address Defendants' defamatory assertions or to explain why, even if any of those false allegations were true, the punishment was inappropriate.  JA3522.  Such a deprivation of any "opportunity to rebut" the purported "factual basis" of the Order is the very definition of a denial of due process. *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014).

### 2.    *The Order Is Unconstitutionally Vague*

The Order's vagueness creates an independent due process violation, as the district court correctly ruled.  A law is unconstitutionally vague if it fails to provide "fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008).  Vagueness is particularly nefarious "[w]hen speech is involved." *Fox*, 567 U.S. at 253-54.

The Order creates uncertainty about the extent of the disabilities placed on Susman—and it leverages that vagueness to intensify the Order's *in terrorem* effect.

The Order leaves no doubt that it will restrict Susman's ability to access federal buildings, engage with federal employees, and associate with clients with government contracts—but the exact *scope* of that restriction is unspecified. And the Order's reference to "interests of the United States" is so standardless that it gives agencies limitless discretion to *further* restrict Susman's access over time. *See* A11. The Order's vagueness is thus designed to give federal agencies sweeping ability to impose severe consequences on Susman for undefined future conduct—and to deter Susman from representations and advocacy that could be perceived as adverse to the President's political interests or the government's interests more broadly. That is a textbook case of unconstitutional vagueness that is designed to enable "arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972).

## II. DEFENDANTS' REMAINING ARGUMENTS FAIL

Instead of coming to grips with the Order's fatal flaws, Defendants raise a scattershot set of procedural and partial defenses for each of the Order's individual provisions. That approach fails: whether considered as a whole or piece by piece, the Order violates the Constitution.

### A. The Order Must Be Analyzed as a Whole

An executive order must "stand or fall as a whole" when it "embodie[s] a single, coherent policy" and serves one "predominant purpose." *Minnesota v. Mille*

*Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999). Here, a single focused purpose animates the entire order: to punish Susman for its protected advocacy. Defendants cannot rescue any part of the Order by slicing and dicing its indivisible retaliatory whole into disembodied components.

Defendants contend that the Order directs "discrete actions that are not dependent on one another for their operation." Gov.Br.65. But there is nothing discrete about them. Every single one of the compounding punishments required by the Order flows inexorably from Section 1's command that "*action is necessary* to address the significant risks, egregious conduct, and conflicts of interest" alleged against Susman. A11 (emphasis added). And every single one of those punishments aims to effectuate the unifying purpose announced in Section 1 of preventing Susman from practicing law—based on the Order's spurious invocations of the national interest. Even the President seemed to recognize that the Order's sections do not "stand alone," Gov.Br.64, as he decided *not* to include a severability clause in the Susman Order, in stark contrast to other executive orders he has issued, *cf. League of United Latin Am. Citizens v. EOP*, 780 F. Supp. 3d 135, 220-21 (D.D.C. 2025) (finding severable an executive order with a severability clause).

Even if an individual section of the Order could operate on its own, wholesale invalidation of the Order would still be required. This is not a case in which one portion of an order is unconstitutional and the court must consider whether the

30

remaining "provisions are capable of functioning independently." *Seila Law v. CFPB*, 591 U.S. 197, 235 (2020). Here, the constitutional problems infect the Order as a whole. The *entire* Order is retaliation against Susman for its protected advocacy activities and perceived viewpoints, in violation of the First Amendment. *See* pp. 13-23, *supra*. The *entire* Order maligns Susman's "good name," "reputation," and "integrity" without "notice and an opportunity to be heard," in violation of the Due Process Clause. *Constantineau*, 400 U.S. at 437; *see* pp. 25-28, *supra*. And the *entire* Order was issued without constitutional or statutory authority, in violation of the separation of powers. *See* Wilmer.Br.26-29. The Order is thus unconstitutional *in toto*.

### B.    Section 1 Must Be Enjoined

Defendants also contend that the district court should have left Section 1 standing because it is mere presidential speech, is severable, and could serve as the basis for valid actions in the future. Those contentions are meritless. JA3536.

The President can, of course, say or refrain from saying whatever he wants. But the Order targeting Susman, like all executive orders, is an exercise of the President's power. Its words are commands, not mere speech. Executive officials must carry out those commands or risk being fired. And the words that President Trump chose to put into the Order dictate not only *what* punishments his subordinates must inflict on the Firm but also *why* the President has ordered their

31

infliction.  Its text states explicitly that the President wants to prevent Susman from practicing law because the President is angered by the clients the Firm represents and the causes it espouses.  And it is Section 1 that contains the statement that "action is necessary" to deal with the supposed threat Susman poses to the national interest.  A11.

Section 1 is therefore punishment in action, not mere presidential speech.  The President's freedom to speak his mind does not encompass using "the power of the State to punish or suppress disfavored expression."  *Vullo*, 602 U.S. at 188; *see id.* at 194-95; JA3497 (district court).

Scrambling to save Section 1, Defendants nevertheless insist that it can survive if "shorn of its enforcement mechanisms" because it "does not direct any action" on its own.  Gov.Br.63 (citations omitted).  That argument fails for the reasons stated above:  the entire Order is an inseverable effort to punish Susman for its protected speech.  Moreover, Section 1 itself unquestionably has operative effect: it announces the President's finding that Susman's advocacy activities are "detrimental to critical American interests" and sets an Executive-Branch policy that those who engage in such activities "should not have access to our Nation's secrets nor be deemed responsible stewards of any Federal funds."  A11.  Because they are set forth in an Executive Order, those determinations bind every executive agency to continue punishing Susman.  *See, e.g.*, *N. Am.'s Bldg. Trades Unions v. DOD*,

32

783 F. Supp. 3d 290, 310 (D.D.C. 2025); *accord* Gov.Br.43 ("[T]he Executive's subordinates are 'duty-bound' to abide by [the President's] direction.").

Unable to deny those points, Defendants hedge, stating that "if in the future defendants take concrete actions based on Section 1, courts could review those actions at the time and enjoin them if appropriate." Gov.Br.64. That is cold comfort. Any actions taken based on Section 1's false statements about Susman's activities would necessarily be unconstitutional retaliation for Susman's protected advocacy. And if Section 1 were left intact, it would continue to inflict unconstitutional harms on Susman on its own—chilling the Firm's First Amendment activities, damaging its reputation, and threatening its client relationships. *See* JA3530-JA3531. Section 1 would continue to lay about like a loaded gun, threatening even more severe future consequences—especially considering the many circumstances in which agencies are called on to consider the national interest when exercising their authority. By contrast, Defendants suffer no harm if the Executive Branch is required to justify future actions by articulating reasons that are not blatantly unconstitutional. *Contra* Gov.Br.64. As the district court explained, its injunction does not "'muzzl[e] the Executive'" or "enjoin[] the President's speech"; it simply prevents defendants from "implementing or giving effect" to any part of the unconstitutional Order. JA3498 (citation omitted).

33

### C.    Susman's Challenges to Sections 3 And 5 Are Justiciable

Defendants also raise justiciability defenses, but their arguments fail. Susman's claims are both ripe and reviewable.

"Damocles's sword does not have to actually fall" before a plaintiff may seek relief. *League of Women Voters v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). "[A] case is ripe when it presents a concrete legal dispute" and "no further factual development is essential to clarify the issues." *In re Al-Nashiri*, 47 F.4th 820, 826 (D.C. Cir. 2022) (citation modified).

Susman's challenges readily meet that standard. As the district court found, "the Order was issued in response to Susman's First-Amendment-protected activities." JA3506. It punishes Susman for positions the Firm has taken and clients it has represented. No additional facts are required—those First Amendment violations are "clear from the face of the Order and the record." JA3506. The same is true for Susman's remaining claims. Whether the Order exceeds the President's authority, was imposed without due process, and is void for vagueness are legal questions that do not turn on future contingencies. And infringements of the right to counsel and equal-protection guarantee are also plain on the Order's face. Each claim turns on known facts about the Order's timing and text—not on future factual development. That is why the district court had no trouble adjudicating Susman's challenges and enjoining the Order in full. JA3505-JA3529, JA3535-JA3536.

Defendants contend that Susman must defer challenging Sections 3 and 5 because those provisions "contemplate future implementation." Gov.Br.49. That argument is meritless. Sections 3(a), 3(b)(i), and 5(b) apply immediately, requiring Susman's federal-contractor clients to disclose their relationship with Susman, forcing agencies to terminate contracts with Susman, and restricting the government's hiring of Susman employees.

Although Sections 3(b)(ii) and 5(a) call for implementation, the Order is unequivocal about how that implementation will play out. Section 3(b)(ii) instructs that, after reviewing Susman's clients' contracts, agencies must "align" contracting decisions with the "interests of the citizens of the United States." A12. Section 5(a) likewise directs agencies to limit Susman's access to federal facilities to ensure "consistency" with the "interests of the United States." A13. Meanwhile, Section 1 finds that Susman has engaged in "activities inconsistent with the interests of the United States." A11. The Order itself therefore *already* makes the findings dictating the agencies' future actions, *requiring* them to restrict employees' access to federal facilities and terminate contracts that could benefit Susman.

The Administration has confirmed as much. The Order's "Fact Sheet" stated unequivocally that the "Federal Government *will* ... restrict [Susman] employees' access to government buildings." JA3150 (emphasis added). It also promised that agencies "*will* terminate contracts that involve Susman"—not just contracts "with"

Susman, but any that "involve" the Firm. *Id.* (emphasis added). That is an unambiguous statement that the Administration will terminate any client's federal contract that might indirectly benefit Susman. *Id.*; *see* A11 ("[N]or should [Susman's] conduct be subsidized by Federal ... contracts."). And when the White House Staff Secretary handed President Trump the Order to sign, the Secretary stated that "[t]his is an executive order that takes certain measures against Susman Godfrey to ensure that they can't access government resources, government buildings." JA3096.

Accordingly, Sections 3 and 5 have already created a concrete dispute, inflicting an immediate and severe blow to Susman's ability to generate and retain business. Clients will be disinclined to retain Susman if they must cede their federal contracts to do so. And the effectiveness of Susman's representation depends on its unfettered ability to appear in federal forums and engage with federal personnel. Indeed, even mere uncertainty about the services the Firm could commit to providing would have wide-ranging negative effects—akin to those experienced by other firms targeted by similar executive orders in the days before they obtained TROs. JA3131. Such harms are concrete and immediate and create a ripe controversy. JA3488, JA3535-JA3539.

Defendants double down on their ripeness argument by invoking the standard that applies to facial challenges, Gov.Br.50-51, but that discussion only confirms

36

that the dispute is ripe. They insist that this Court cannot evaluate whether Sections 3 and 5 have constitutional applications without knowing how those provisions will be implemented. But, as noted, the guidance that will issue absent an injunction will penalize federal-contractor clients who continue to work with Susman and limit Susman's access to federal buildings and employees, all because of the Firm's constitutionally protected expression. Any possible version of those directives would necessarily commit a raft of constitutional violations and exceed the President's authority. *See generally* Part I, *supra*.

Moreover, the promise of future punitive guidance would violate the First Amendment even if that promise were never fulfilled. A mere "credible threat" of government sanction can violate the First Amendment. *Chamber of Com. of U.S. v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995). And the Order is more than a credible threat. It allows agencies to tighten sanctions until they are "consisten[t]" and "aligned" with the Nation's "interests." A12-A13. That the details are not yet spelled out does not make the constitutional violations more remote; it exacerbates them. The Order conveys an unmistakable and ominous message: the more that Susman engages in representations that the Administration disfavors, the more severe the penalties will be. It is hard to conceive of a scheme more clearly designed to chill protected speech.

37

**D.    Section 3 Is Not a Valid Exercise of the Procurement Power**

Defendants briefly assert that Section 3 is a traditional exercise of the "procurement power to combat racial discrimination or otherwise implement social policies" and that it is "narrowly tailored" to that end.  Gov.Br.53, 57.  But again, the undisputed factual record—including Defendants' numerous concessions below—refutes the accusation that Susman engaged in discrimination, *see* pp. 21-22, *supra*.  The President also has ample enforcement tools to combat actual discrimination; for instance, last year the President issued a separate executive order on "ending illegal preferences and discrimination" in federal contracting.  *See* Executive Order 14173 § 3, 90 Fed. Reg. 8633, 8633 (Jan. 21, 2025).  If the goal were really to stamp out invidious discrimination in the contracting system, one might think the earlier order was sufficient.  The true objective, of course, is something else entirely:  to use the procurement power to punish Susman for the Firm's protected speech, as the district court correctly ruled.  JA3511.

Defendants' "narrow tailoring" argument is in all events meritless.  Even if the Order's discrimination allegations were not false, Section 3 sweeps far beyond any plausible effort to address discrimination by Susman:  it requires *all* of Susman's *clients* with government contracts to identify themselves, and then directs agencies to terminate *all* such contracts in order to further the national interest as the Order defines it.  That is not narrow tailoring; it is instead confirmation that Section 3, like

38

the rest of the Order, is not tailored to any purported interest other than punishing Susman.

### E.    Section 4 Must Be Enjoined

The district court was correct to enjoin Section 4 as well.  Section 4 orders the EEOC and DOJ to target Susman with Title VII investigations.  The White House's Fact Sheet accompanying the Order says just that, warning bluntly that "[t]he practices of Susman *will be reviewed* under Title VII."  JA3150 (emphasis added).  As the district court explained, and "as the parties agreed" at summary judgment, "should the court find that there have been violations of the First Amendment, it may enjoin the Commission and the Attorney General from commencing an investigation on the basis of the Order."  JA3503.  That is precisely what the district court found and precisely what the district court did.

Yet Defendants nonetheless insist that Section 4 merely applies to "large law firms generally" without "singl[ing] out" Susman.  Gov.Br.46.  That is nonsense.  Section 4 appears in an Executive Order entitled "Addressing Risks from Susman Godfrey" and is predicated on findings specific to Susman.  A11.  Section 4 cannot be divorced from that context and structure.  And although Section 4's text states that "[n]othing in this order shall be construed to limit the action authorized by section 4" in the Perkins Order, A13, there is nothing in the Susman Order that could even plausibly limit Section 4 of the Perkins Order.  The only plausible effect of

39

Section 4 of the Susman Order is the one the White House articulated in its Fact Sheet: the investigations called for in Section 4 of the Perkins Order must now be trained on Susman as well.

Defendants emphasize that the investigations directed in Section 4 are "*already* what the EEOC is supposed to be doing," Gov.Br.42, and "what DOJ already does," Gov.Br.46. But that only reinforces Susman's point. If the current work of the EEOC and DOJ were already sufficient to fit the President's interests, there would have been no need for Section 4. The only reason to include it was to focus the attention of the EEOC and DOJ on Susman—and such a targeted retaliatory investigation subjects Susman to expense, risk, and potential public opprobrium based on its protected speech.

Defendants gain nothing by observing that Susman "did not even receive a letter from the EEOC." Gov.Br.46. The letters Defendants reference were sent prior to the issuance of the Order here. The absence of a pre-Order letter to Susman reveals nothing about the effect of the Order; it goes to show only that the President's baseless view that Susman "engages in unlawful discrimination" was not shared by the agency charged with enforcing civil rights in employment. A11. And that the EEOC did not send a letter *after* the Order likewise proves nothing about the Order's effect, because the Order was enjoined within days of its issuance. JA2990-JA2992. Absent such an injunction, Section 4 would immediately threaten Susman with

targeted investigations in retaliation for its speech—easily establishing Susman's standing for a "pre-enforcement challenge."  *Contra* Gov.Br.46; *see Chamber of Com.*, 69 F.3d at 603 ("credible threat" of investigation that runs afoul of First Amendment is sufficient for standing).

## CONCLUSION

This Court should affirm.


Dated:  March 27, 2026                    Respectfully submitted,

                                          */s/ Donald B. Verrilli, Jr.*
                                          Donald B. Verrilli, Jr.
Brad D. Brian                             Elaine J. Goldenberg
Hailyn J. Chen                            Ginger D. Anders
Adam B. Weiss                             Jeremy S. Kreisberg
MUNGER, TOLLES & OLSON LLP                Kyle A. Schneider
350 S. Grand Avenue                       Esthena L. Barlow
  50th Floor                              MUNGER, TOLLES & OLSON LLP
Los Angeles, CA 90071                     601 Massachusetts Ave. NW
(213) 683-9100                              Suite 500E
                                          Washington, DC 20001
                                          (202) 220-1100
                                          Donald.Verrilli@mto.com

*Counsel for Appellee Susman Godfrey LLP*

41

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellant Procedure, the undersigned counsel hereby certifies that this brief complies with the type volume limitation of the court's February 6, 2026 order.  As measured by the word-processing system used to prepare this brief, there are 8,988 words in the brief excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and D.C. Cir. Rule 32(e)(1).

Dated:  March 27, 2026                    */s/ Donald B. Verrilli, Jr.*
                                          Donald B. Verrilli, Jr.

42

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2026, a true and correct copy of this Brief was filed via the Court's electronic filing system, which will forward a copy to all counsel of record.  I certify that all participants in this case are registered CM/ECF users.

Dated:  March 27, 2026                    */s/ Donald B. Verrilli, Jr.*
                                          Donald B. Verrilli, Jr.

43